UNITED STATES DISTRICT COURT    FILED
DISTRICT OF MASSACHUSETTS    CLERKS OFFICE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 2005 MAR 23  P 4: 57 |
| v. | ) | |
| | ) | CRIMINAL NO. 04-10183-MLW |
| JAMES W. SULLIVAN | ) | DISTRICT OF MASS. |
| Defendant | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM IN OPPOSITION TO DEFENDANT'S SENTENCING MEMORANDUM

### I.    Introduction

The United States of America, by its attorneys, Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Carmen M. Ortiz, Assistant U.S. Attorney, hereby oppose James Sullivan's ("Sullivan") sentencing memorandum in which he seeks a sentence substantially below the advisory guideline range, on the basis of factors that are not relevant, exceptional or just. First, the government agrees with the sentencing guideline determinations set forth in the Pre-Sentence Report ("PSR") and will base its recommendation in accordance with the PSR and pursuant to a plea agreement signed by the parties.

Second, the government strongly disagrees that Sullivan is entitled to a one point reduction on the adjusted offense level on his assertion that the amount of loss is overstated and that he should receive a credit of $280,000 because he allegedly provided services to his former employer, while pretending to be fictitious individuals and companies that he fabricated in order to perpetrate the fraud. During the period of the offense conduct, Sullivan was

1

a senior executive in a salaried position, who was well compensated for his work.  It is the government's position (and the employer's) that even if Sullivan performed any of the services that he claims, while he was defrauding the company he worked for, those services were covered by the scope of his employment *or* completely outside the scope of his employment and not authorized by the company.

Third, the government asserts that Sullivan is not entitled to any reduction in the amount of restitution for the value of stock options which (1) he wrongfully acquired because he was defrauding his employer at the time he received the stock options and the company would never have given Sullivan any stock options if it had been aware of his criminal conduct; and (2) the stock options rightfully expired upon the termination of Sullivan's employment for gross misconduct.  The correct amount of restitution is $692,696.57, the actual amount of money which Sullivan wrongfully received through his scam.

Furthermore, the factors that Sullivan relies on pursuant to 18 U.S.C. §3553(a) to support a sentence that would be completely outside the heartland of the advisory guideline range, are grossly misstated, nothing more than self-serving claims, and insufficient to justify a sentence that would be severely inappropriate under the circumstances.[1]  There was no extraordinary acceptance of

---

[1]Under the sentencing guideline range as calculated in the PSR (¶¶ 25-37, 110), the total offense level is 17, resulting in an imprisonment range of 24 to 30 months.  The defendant is seeking a sentence of home detention, community service, and mandatory

2

responsibility in this case.  The defendant was caught red-handed, and contrary to his assertions, he was not completely forthright when first confronted by his employer. Moreover, despite Sullivan's attempt to cooperate with the government and provide substantial assistance, after a few meetings with defendant, a determination was made that the information did not warrant further federal investigation and did not constitute substantial assistance.  Sullivan's other claims, such as his post-offense rehabilitative conduct, psychological problems, and family ties and responsibilities do not exist to a degree that merits a sentence that would be inconsistent with the punishment intended for individuals in the defendant's position.  The reality is that Sullivan is no different than most white collar criminals, in that he has no prior criminal history, comes from a good family, had the benefit of a good education and employment history, and appears to have been basically a good person until he stole close to $700,000 from a company that had trusted and rewarded his years of service.

In sum, the government urges this Court to reject Sullivan's sentencing recommendation and impose a sentence which is in line with the sentencing guideline range as calculated by the PSR and the plea agreement.  Specifically, the government recommends a term of imprisonment of 24 months, supervised release for a period of two years, a $5,000 fine, $300 mandatory special assessment, and

---

psychological treatment, in essence, what would have previously constituted a seven level departure to Zone B, under the mandatory guideline regime.

restitution in the amount of $692,696.57. Finally, the government moves that the Motion for a Preliminary Order of Forfeiture be allowed.

II.  Full Amount of Loss is $696,696.57 and Restitution
     is Warranted in Such Amount

     A.  Loss Amount is Correct as Defendant is Not Entitled
         to Any Credit for Alleged Services Provided

Sullivan's argument that he is entitled to receive sentencing credit for the value of services he allegedly provided to M/A-COM, while he was defrauding the company, completely disregards the fact that he was already being well compensated for any work he did for M/A-COM. As the Director of Human Resources for Support and International Field Sales, Sullivan earned a lucrative salary that was well over $125,000 per year, with additional bonus payments. (PSR ¶ 76). During the period from 1997 through 2001, Sullivan was paid a total of approximately $664,411.00 in salary and bonuses, plus he received numerous employee benefits.[2]  In fact, from 2000 to 2001 alone, which were the last two years of the scheme when Sullivan defrauded M/A-COM out of a total of $209,283.33, he received a total of $293,945.00 in adjusted gross income from his employer.[3]  Despite occupying a senior executive

---

[2]See copy of letter from Tyco International, Inc.'s counsel, Arthur Hui, noting defendant's compensation package. (Attached hereto as Exhibit 1, pg. 2).

[3]See PSR, ¶¶ 108, 108(a) indicating defendant's adjusted gross income as reported to the Internal Revenue Service; and summary chart illustrating amount of money Sullivan received from 1996 through 2001, in checks that were made out to the fictitious individuals and entities he purported to be in order to commit the fraud, attached

position, and as such, receiving a set salary with bonuses rather than working on an hourly basis, Sullivan claims that the loss amount should be decreased by $280,000, the value of services he provided from 5 to 7 AM, during late evening hours, and during weekends.[4]  Sullivan asserts that he worked on projects for recruiting, advertising, and case research services. (Def.Sen.Mem. at 5).[5]  Indeed, it is incredulous that Sullivan argues that he provided these services at a discount and that the company would have paid more if it had contracted the work out!  Id.

The government submits that there is no evidence that M/A-COM benefitted in any way from the "extra" services that Sullivan claims to have provided during the fraud scheme.  A general search and review of certain records and files by M/A-COM, failed to turn up any work produced by the defendant that would have merited any extra compensation.[6]  Irregardless, even if Sullivan had performed

hereto as Exhibit 2.  A breakdown of the amounts of money that Sullivan received annually through his fraud scheme from M/A-COM is provided herein, attached as Exhibit 3.

[4]See Defendant's Sentencing Memorandum ("Def.Sen.Mem.") at 5.

[5]The type of work that Sullivan claims he performed and should be credited for, was work that was either performed by others at M/A-COM or that the company would specifically contract out.  Jeffrey Howe, former Director of Human Resources and Sullivan's supervisor during the offense conduct has stated that Sullivan would not have been authorized to do recruiting or advertising and that no exempt employee got money for services above and beyond his or her normal work duties.
(See Jeffrey Howe, Memo of Interview dated January 18, 2005, attached hereto as Exhibit 4 at pg. 2).

[6]Although a thorough search of records by M/A-COM was not feasible, as noted in the Government's Opposition to Defendant's Motion for Exculpatory Evidence, a general search was conducted of certain case files presumably worked on by Sullivan during the offense

any of the work he claims to have done, he is not entitled to any
"extra" compensation, as he was already on M/A-COM's payroll in a
salaried position and any work done by him was within the scope of
his employment.  Furthermore, if Sullivan performed work that was
outside the scope of his employment, such as developing
"advertising themes" as he claims, it would constitute work he was
not authorized to do and not within the scope of his employment.
As Sullivan well knew, any work that he performed outside the scope
of his employment, in an attempt to receive extra pay, was clearly
a conflict of interest and in direct violation of the M/A-COM Code
of Conduct.[7]  Given Sullivan's expertise in human resources and
knowledge of company policy, he knew he had no right to any extra
compensation.  That is probably one reason why he sought funds from
his company through the commission of a fraud.

     Sullivan wrongfully argues that "controlling case law"
overwhelmingly supports his position that the amount of loss should
be decreased by the value of services he provided to his employer.
All of the cases he cites are clearly distinguishable from the
facts in this case and deal with defendants in significantly
different situations than that of Sullivan. (Def.Sen.Mem. at 3-4).

---

conduct, and no evidence of "work product" was found. (See letter by
Kevin Kelleher, Director of Accounting, attached hereto as Exhibit 5).

     [7]See excerpt from M/A-COM Code of Ethical Conduct ("Code") at 9,
attached hereto as Exhibit 6, along with various acknowledgments
signed by defendant.  Furthermore, the Code makes clear that
violations of any standards can result in termination and prosecution
in the courts. (Ex. 6 at 12).

6

In particular, Sullivan's reliance on <u>United States v.</u>
<u>Redemann</u>, 205 F.Supp.2d 887 (E.D. Wisc. 2003), is completely
misplaced as that case involved a defendant who was a labor
contractor, who conspired to commit bank fraud by submitting
inflated invoices for work he actually performed, that enhanced the
property value of the bank. <u>Redemann</u>, 205 F.Supp.2d at 898.  Unlike
the case before the court, the defendant in <u>Redemann</u> did not occupy
a management position nor was he a salaried employee of the victim
bank.  The court concluded that the $2.5 million loss that
defendant was being held accountable for, overstated the severity
of the offense where the defendant actually received only
$806,447.48, of which $300,000 was estimated as the value for
construction work he had done on the bank. <u>Redemann</u>, 205 F.Supp.2d
at 898.  In reaching this result, the court noted that the
defendant in <u>Redemann</u> was, (1) recruited to participate in the
fraud scheme; (2) did not control the amount of loss in the scheme,
which was directed by the coconspirator; and (3) received a
minuscule amount of the gain compared to the total amount taken.
<u>Id</u>. at 899-900.  Here, the facts are wholly inapposite to those in
<u>Redemann</u>, given that Sullivan was an employee of the victim,
directed the entire scheme, controlled the amount of loss, and
solely received the full amount and benefit of the loss.[8]  Sullivan,

_____

[8]None of the cases Sullivan relies on to argue that the loss
amount should be credited with the value of services rendered, relate
to a defendant employee, engaged in a fraud upon their employer. See

who was a trusted employee and stood in a role model position as
Director of Human Resources for support services, should not be
credited in any way whatsoever for alleged services that he claims
he performed while defrauding his employer of over $700,000 from 1996
to 2001.

     B.   <u>Restitution Should be Ordered in Full Amount
of $692,696.57 and Should Not be Reduced by the
Value of Sullivan's Previously Owned Stock Options</u>

Sullivan's claim that the amount of restitution should be
further reduced by the value of his stock options should be
rejected. First, the defendant should not receive any credit for
the value of stock options that he received under false pretenses,
in light of the fact that unbeknownst to M/A-COM, he was defrauding
the company when it granted him the first set of stock options in
July 1996.[9] Under the company's stock option plan, stock options
were awarded to certain key employees to encourage a proprietary
interest in the company, to provide added incentives to contribute
to the future growth and profitability of the company, and to

---

United States v. Sublett, 124 F.3d 693, 694 (5th Cir. 1997)(defendant,
who fraudulently procured government contracts, entitled to credit in
loss amount for legitimate counseling services provided under
contracts obtained); United States v. Palmer, 122 F.3d 215,221 (5th
Cir. 1997)(defendant engaged in telemarketing scheme, received a
reduction in loss amount for value of products received by victims);
United States v. Smith, 951 F.2d 1164, (where defendant fraudulently
obtained loans to build homes, no actual loss found due to security
interests in homes and no defaults on the loans had occurred).

    [9]See Ex. 2, which indicates that first check issued pursuant to
fraudulent invoice submitted by Sullivan was 6/28/96.

attract and retain exceptionally qualified employees.[10]  If the
company had been aware of Sullivan's fraudulent scheme, it never
would have issued him stock options.

Secondly, there was no commitment from M/A-COM nor was the
defendant ever promised the opportunity to resign and to tender his
stock options to lessen the loss of the fraud to the company.
Sullivan misleads this Court by asserting that on December 11,
2001, he was told by M/A-COM executives, Jeffrey Howe
("Howe")(Director of Human Resources) and Kevin Kelleher
("Kelleher")(Director of Accounting) that if he was not kept on as
an employee, he would be allowed to resign and tender his stock
options and make other repayment. (Def.Sen.Mem. at 7).  In fact,
when Sullivan was first confronted on December 11th, he continued
to deceive his employer into believing that he had conducted
business with Economatrix and MBNA (non-existent companies), in
violation of company policy (i.e. it was against company rules to
be a vendor).[11]  Contrary to Sullivan's assertions that he was
"completely forthright" (PSR ¶ 23), he repeatedly told a series of
lies to Howe and Kelleher, among them that: (i) Economatrix was
opening an account; (ii) Sullivan knew Economatrix's address and
they had a federal tax Id; (iii) Carlos Reyes was the principal or

---

[10]See AMP Incorporated Nonqualified Stock Option Agreement
(Sullivan was employed by AMP, which was then acquired by M/A-COM),
attached hereto as Exhibit 7.

[11]See summary of notes taken by Jeffrey Howe of questions
responded to by Sullivan, attached hereto as Exhibit 8.

president of Economatrix; (iv) Economatrix International Limited,
Inc. was not registered, but he thought they were incorporated; (v)
Mail Box Direct National Advertising placed advertisements in
minority publications for them; (vi) Sullivan could provide a
contact at MBNA for them; (vii) Sullivan was involved with MBNA and
Economatrix; (viii) he started doing this over a year ago as a
service for a friend (in fact he had started the scheme well over
5 years prior); (ix) he had been paid about 80%-85% of what the
companies had received; (x) amount repayable was about $60,000; and
(xi) there were no other vendors with which he had a similar
arrangement. (Ex. 8). On that date, Sullivan was suspended and
told that the seriousness of the problem was grounds for
termination. It is clear that M/A-COM had no idea of the nature or
extent of the fraud that Sullivan perpetrated. Instead of
admitting to the full scope of the fraud, Sullivan lead Howe and
Kelleher to believe that he had been involved in a conflict of
interest situation involving $60,000. If the company had known the
truth on that date, it would have done what it had every right to
do - terminate Sullivan and extinguish his rights to all stock
options.[12]

Furthermore, Sullivan misrepresents the conversation that
occurred on the following day, when he states that he was allowed
to repay M/A-COM by tendering his stock. Kelleher's notes make

---

[12]Stock options will terminate immediately upon termination of
employment, unless the "Committee" determines otherwise in its sole
discretion. (Ex. 7 at 3, 3.1).

clear that they would look into the feasibility of Sullivan's proposal, but they were not in any position of authority to make that determination.[13]  All the stock options were frozen on December 11, and the company was in the process of assessing the situation. Although there is no question that Sullivan wanted to use his stock options to reduce the amount of loss, there was never any agreement to take such action by anyone empowered to make that decision at M/A-COM.  Given Sullivan's experience in human resources and knowledge of company policy, it is inconceivable that he truly believed otherwise at this juncture.  Although he claims that he could have exercised his stock options during the six weeks of his suspension and notice of termination, that is not exactly so, because the stock options were frozen as of December 11th. (Ex. 9). More importantly, if Sullivan had not deceived Howe and Kelleher on December 11th and, instead, revealed the true extent of the fraud, he would have been immediately terminated and his options would have expired.

It is amazing that Sullivan argues that as a matter of fairness and in the interests of justice, the restitution figure should be reduced by $532,028.18, the value of services he claims he provided and the value of the stock options.  It seems he has lost sight of the fact that he betrayed his employer and received the options under false pretenses; deceived his co-workers; was

---

[13]See copy of Kelleher's notes, attached hereto as Exhibit 9, and Ex. 4, Howe's Memorandum of Interview at 2.

evasive and untruthful when first confronted; and now continues to
exaggerate and misrepresent what happened.  In sum, it would be
completely unfair and unjust to the victim for this Court not to
order the entire amount of restitution, which is $692,696.57, and
which the defendant has the means to pay.

III.  <u>Sullivan's Sentence Recommendation is Unreasonable
      Pursuant to 18 U.S.C. § 3553(a)</u>

In <u>United States v. Booker</u>, 125 S.Ct. 738, 757 (2005), the
Supreme Court held that the Federal Sentencing Guidelines were no
longer mandatory, but were rather "advisory."  While district
courts are not bound to apply the Guidelines, they must consult
those Guidelines and take them into account when sentencing. Id. at
767.  In reaching a sentence that is appropriate and reasonable,
both the Guidelines and factors established in 18 U.S.C. § 3553(a)
are to be considered.  Sullivan has cited a series of factors which
he  claims  merit  a  sentence  that  in  effect,  constitutes  a
significant downward departure.  None of the factors Sullivan
relies on warrant such a result.

A.  <u>There has been no Extraordinary Acceptance
    of Responsibility by Sullivan</u>

Sullivan's acceptance of responsibility, in that he admitted
to his wrongdoing early on and agreed to plead guilty, has already
been  taken  into  account  by  a  three  point  reduction  in  the
calculation of the sentencing guideline range arrived at by the
Probation Department.  (PSR ¶ 36).  Sullivan points to his
"forthright" confession to M/A-COM officials on December 11, 2001

12

and his post-offense conduct of offering to tender his stock options as "extraordinary" acceptance of responsibility, that demonstrate his individual characteristics and personal history. (Def.Sen.Mem. at 11).

First, for reasons noted above, Sullivan was anything but forthright when first confronted. (See Ex. 8). In fact, to make such argument before this Court, given the summary of notes from his meeting with Howe and Keller, indicates his continuing deceptive nature. Sullivan exaggerates the context of his proffer session on June 17, 2002 and tries to make much ado about his admissions, claiming that he saved the government and Court the resources needed to prepare for trial. (Def.Sen.Mem. at 11). This entire argument defies the fact that he was caught red handed by his company, and an internal investigation (including an audit) left Sullivan with no escape. Secondly, his offer of stock options was an empty one, in that he knew that upon termination for his criminal conduct, he would lose them. More importantly, knowing he had been scamming his company for more than 5 years, he also knew he was not entitled to have them in the first place.

Sullivan should receive no positive consideration under this factor. This is not a case where he, on his own, ended the fraud and turned himself in. This is not a case where he immediately told them he had fabricated numerous individuals and companies and had submitted phony invoices for close to $750,000. This is not a case where he has paid a penny of resitution. Instead, from the

13

outset, Sullivan has contested the loss on no valid or legitimate reason, sought to benefit from options he illegally obtained, and now, despite a plea agreement, relies on numerous "factors" to obtain a sentence that is significantly below what he deserves. There is nothing extraordinary, but rather questionable, about Sullivan's acceptance of responsibility.

B.    There was No Substantial Assistance or Cooperation
      by Sullivan that Merits a Reduction in His Sentence

The government does not dispute that Sullivan attempted to provide substantial assistance, in that, he participated in two proffer sessions with prosecutors and then met on three separate occasions with Special Agent Joseph McGovern (Department of Transportation) to provide information. After consideration, a determination was made that Sullivan's information did not rise to the level of substantial assistance, and a motion for a §5k1.1 downward departure was not warranted.

Although Sullivan claims that he voluntarily cooperated and, indeed, exaggerates the degree of his cooperation by claiming that he met on a "regular basis" over the course of several months with government investigators, that in and of itself does not merit a lighter sentence in this case. There were no promises made to the defendant, and he was merely given an opportunity to provide substantial assistance.

C.    Sullivan's Post-Offense Rehabilitative Conduct
      and Lack of Potential Recidivism Are Not Worthy
      of a Sentence Reduction

Sullivan argues that his post-offense conduct of becoming an EMT, volunteering part-time at Salem Hospital, and attempting to head to Sri Lanka to assist in the tsunami relief efforts, indicates rehabilitative conduct that merits a reduction in his sentence.[14] Although Sullivan claims that he has done all this because he wants to demonstrate his commitment to public service, there is no question that he is also motivated to put himself in the best light for sentencing.[15]

While getting a certification to be an EMT is a practical endeavor, it hardly qualifies as the great achievement Sullivan purports it to be. Additionally, his volunteering more time at the hospital, while a good deed, is also a result of extra time on his hands and his need to participate in activities that he hopes will garner him a lighter sentence. Furthermore, Sullivan's stated efforts to go to Sri Lanki and his attempt to make it appear as

---

[14]Civic, charitable, public service related work, employment related work and record of prior good works are generally discouraged factors under the sentencing guidelines. §5H1.11.

[15]It is important to note that the First Circuit has stated that presentence rehabilitation is usually taken into account in acceptance-of-responsibility credit, and that a downward departure is only given to defendants who demonstrate extraordinary presentence rehabilitation. United States v. Bogdan, 284 F.3d 324, 328, n.4 (1st Cir. 2002); See also United States v. Craven, 239 F.3d 91, 99 (1st Cir. 2001)("Craven I")("downward departures for pre-sentence rehabilitation are hen's-teeth rare, and our precedent makes clear that such departures should be granted sparingly"). This is so because pre-sentence rehabilitation "can be factored adequately into the sentencing equation by an acceptance-of-responsibility credit," Craven I, 239 F.3d at 99, and because "[s]ome degree of pre-sentence rehabilitation is usually to be expected from a penitent defendant, or one who genuinely shoulders responsibility, or even from one who simply wants to put his best foot forward at sentencing, hopeful of lightening the load." Id.

though he was specifically contacted by the United Nations
Volunteers to assist in the organization's relief efforts, doesn't
ring true.  A close reading of Def.Sen.Mem. Ex.9 indicates that a
general email went out seeking medical and healthcare volunteers,
and the defendant responded by filling out an application. The
defendant was not individually signaled out, and in reality, would
not have been accepted if he had revealed his status as a convicted
felon awaiting sentence.[16]  Again, there is a degree of deception
in defendant's assertions that conflict with true, extraordinary
rehabilitative conduct.[17]

Finally, Sullivan's age and education should play no role in
reducing his sentence under the circumstances in this case.  Given
that the sentence imposed needs to reflect the seriousness of the
offense, to promote respect for the law, to provide just punishment
for the offense, and to afford adequate deterrence to criminal
conduct, §3553(a)(2)(A)&(B), only the sentence provided for in the
advisory guidelines (24-30 months imprisonment) accomplishes such
goals.  Sullivan's age do not prevent him from serving time in
prison and the fact that his age and education make it unlikely
that he will commit fraud again, do not control what is the most
reasonable sentence in this case.  Sullivan relies on United States

---

[16]See Government's Opposition to Defendant's Motion Requesting
Permission to Travel Outside of the United States.

[17]A clear example of defendant failing to right the wrongs he
committed pending sentencing is that there has been no claim by him
that he has filed amended tax returns and paid taxes due on the income
he received through his embezzlement.

v. Nellum, 2005 WL 300073 (N.D.Ind.), to support his position that
age, education and lack of recidivism are relevant to sentencing
determinations.  However, in Nellum, the court was dealing with a
57 year old defendant facing a term of 168 months of imprisonment.
In imposing a sentence of 108 months (a 4 level departure), the
court cited various factors, namely, the defendant's "age,
likelihood of recidivism, his status as a veteran, his strong
family ties, his medical condition, and his serious drug
dependency..." Nellum, supra at 5.

    D.   Psychological Evaluation and Treatment Should Play
        No Role in Sentence Imposed

Sullivan has provided a "draft" psychological evaluation by a
Doctor John Daignault, that is not signed. (Def.Sen.Mem. Ex. 10).
The evaluation describes Sullivan's good family upbringing, the
benefit of an education, and a successful employment history.  It
also reveals a very strong family network.  Further, it notes
certain family circumstances that weighed on the defendant, such as
the deaths of particular family members, the assistance in care
provided to a niece and parents.  While the evaluation portrays a
man who cares and provides for his family, and who has dealt with
different stresses in life, it in no way describes any exceptional
circumstances that warrant a departure from the sentence called for
by the guidelines.  The government submits that given its lack of
relevancy as a medical report, it is very likely that defendant
provided it to generate sympathy on his behalf.

17

More importantly, and probably more truthfully, is the information Sullivan provided to the U.S. Probation Department. In essence, he stated that his mental health has generally been satisfactory, and that he has never received a mental health diagnosis, treatment, or medication. (PSR    ¶ 63). Although he claims that he has been "pretty depressed" over his current situation, this has not resulted in any clinical treatment or medication, and is understandable given the potential sentence and circumstances.

   E. Sullivan's Family Circumstances Do Not Warrant
      A Reduced Sentence

Despite Sullivan's portrayal of a very supportive, loving family that is deeply concerned and afraid of what the future will bring if he is incarcerated, in no way does he establish any reason as to why his situation would be significantly different from others in his circumstances. In fact, his family's situation is in a much better posture than that of other defendants facing prison. Sullivan's wife appears to be in good physical health and she has a full time job. They have no children that are dependent on him warranting special care (PSR ¶¶ 56-57; 60(a)). Although there is a niece that he has taken care of for many years, she has a mother and stepfather, attends boarding school, and will still have the defendant's wife to care for her. Sullivan's mother-in-law also appears to be dependant on him, but she lives in his home and will have her daughter available to her.

18

Existing caselaw is unequivocal that being an exemplary parent or spouse is not sufficient to take a case out of the "heartland." United States v. Bogdan, 284 F.3d 324, 329 (1st Cir. 2002); citing United States v. Sweeting, 213 F.3d 95, 102 (3d Cir. 2000)(ruling that though defendant "appears devoted to her children and is a 'substantial influence' on their lives," no departure was warranted); United States v. Tejeda, 146 F.3d 84, 87 (2d Cir. 1998) ("The existence of a stable family (a wife and two children) – something that is by no means extraordinary – does not satisfy the 'exceptional hardship' criterion warranting family circumstances departure."); United States v. Bell, 974 F.2d 537, 538-39 (4th Cir. 1992)(holding that the defendant's role in helping to produce a stable family, and the fact that incarceration would likely disrupt his spousal and parental relationships, is insufficient to grant a downward departure); United States v. Shoupe, 929 F.2d 116, 121 (3d Cir. 1991)(ruling that a defendant who was a good father, regularly visited his child, and paid child support did not qualify as having an extraordinary family circumstance). Despite Sullivan's supportive family and their reliance on him, the facts in the present case simply do not present mitigating circumstances to a degree warranting a reduction in the sentence that is called for by the advisory guideline range. In the end, the defendant is an average white-collar criminal who committed an average white-collar crime.

IV.    Conclusion

For all of the reasons noted above the defendant's sentencing recommendation should be rejected and the sentence recommended by the government imposed. In support of the government's recommendation of 24 months imprisonment and the total restitution of $692,696.57, a victim-impact statement is provided to the Court.[18]

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    _Carmen M. Ortiz_
Carmen M. Ortiz
Assistant U.S. Attorney

Dated: March 23, 2005

---

[18]Attached hereto as Exhibit 10 is a letter dated March 22, 2005, signed by Kevin Kellerher, Director of Accounting at M/A-COM. which undersigned counsel received late this afternoon.

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served upon the person listed below one copies of the Government's Sentencing Memorandum in Opposition to Defendant's Sentencing Memorandum, with attached Exhibits and the Government's Motion for Preliminary Order of Forfeiture by hand delivery:

        Stephen R. Delinsky, Esq.
        Eckert Seamans C&M, LLC
        1 International Place
        Boston, MA 02110

This 23rd day of March 2005.

                                      Carmen M. Ortiz
                                      Assistant U.S. Attorney