UNITED STATES DISTRICT COURT   FILED
DISTRICT OF MASSACHUSETTS   CLERK'S OFFICE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 2005 MAR 23 P 4: 57 |
| v. | ) | |
| | ) | CRIMINAL NO. 04-10183-MLW |
| JAMES W. SULLIVAN | ) | DISTRICT OF MASS. |
| Defendant | ) | |
| | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM IN OPPOSITION
TO DEFENDANT'S SENTENCING MEMORANDUM

I.   Introduction

The United States of America, by its attorneys, Michael J.
Sullivan, United States Attorney for the District of Massachusetts,
and Carmen M. Ortiz, Assistant U.S. Attorney, hereby oppose James
Sullivan's ("Sullivan") sentencing memorandum in which he seeks a
sentence substantially below the advisory guideline range, on the
basis of factors that are not relevant, exceptional or just.
First, the government agrees with the sentencing guideline
determinations set forth in the Pre-Sentence Report ("PSR") and
will base its recommendation in accordance with the PSR and
pursuant to a plea agreement signed by the parties.

Second, the government strongly disagrees that Sullivan is
entitled to a one point reduction on the adjusted offense level on
his assertion that the amount of loss is overstated and that he
should receive a credit of $280,000 because he allegedly provided
services to his former employer, while pretending to be fictitious
individuals and companies that he fabricated in order to perpetrate
the fraud.  During the period of the offense conduct, Sullivan was

1

a senior executive in a salaried position, who was well compensated for his work.  It is the government's position (and the employer's) that even if Sullivan performed any of the services that he claims, while he was defrauding the company he worked for, those services were covered by the scope of his employment or completely outside the scope of his employment and not authorized by the company.

Third, the government asserts that Sullivan is not entitled to any reduction in the amount of restitution for the value of stock options which (1) he wrongfully acquired because he was defrauding his employer at the time he received the stock options and the company would never have given Sullivan any stock options if it had been aware of his criminal conduct; and (2) the stock options rightfully expired upon the termination of Sullivan's employment for gross misconduct.  The correct amount of restitution is $692,696.57, the actual amount of money which Sullivan wrongfully received through his scam.

Furthermore, the factors that Sullivan relies on pursuant to 18 U.S.C. §3553(a) to support a sentence that would be completely outside the heartland of the advisory guideline range, are grossly misstated, nothing more than self-serving claims, and insufficient to justify a sentence that would be severely inappropriate under the circumstances.[1]  There was no extraordinary acceptance of

---

[1]Under the sentencing guideline range as calculated in the PSR (¶¶ 25-37, 110), the total offense level is 17, resulting in an imprisonment range of 24 to 30 months.  The defendant is seeking a sentence of home detention, community service, and mandatory

2

responsibility in this case. The defendant was caught red-handed, and contrary to his assertions, he was not completely forthright when first confronted by his employer. Moreover, despite Sullivan's attempt to cooperate with the government and provide substantial assistance, after a few meetings with defendant, a determination was made that the information did not warrant further federal investigation and did not constitute substantial assistance. Sullivan's other claims, such as his post-offense rehabilitative conduct, psychological problems, and family ties and responsibilities do not exist to a degree that merits a sentence that would be inconsistent with the punishment intended for individuals in the defendant's position. The reality is that Sullivan is no different than most white collar criminals, in that he has no prior criminal history, comes from a good family, had the benefit of a good education and employment history, and appears to have been basically a good person until he stole close to $700,000 from a company that had trusted and rewarded his years of service.

In sum, the government urges this Court to reject Sullivan's sentencing recommendation and impose a sentence which is in line with the sentencing guideline range as calculated by the PSR and the plea agreement. Specifically, the government recommends a term of imprisonment of 24 months, supervised release for a period of two years, a $5,000 fine, $300 mandatory special assessment, and

---

psychological treatment, in essence, what would have previously constituted a seven level departure to Zone B, under the mandatory guideline regime.

3

restitution in the amount of $692,696.57.  Finally, the government
moves that the Motion for a Preliminary Order of Forfeiture be
allowed.

II.  **Full Amount of Loss is $696,696.57 and Restitution is Warranted in Such Amount**

   A.  **Loss Amount is Correct as Defendant is Not Entitled to Any Credit for Alleged Services Provided**

Sullivan's argument that he is entitled to receive sentencing
credit for the value of services he allegedly provided to M/A-COM,
while he was defrauding the company, completely disregards the fact
that he was already being well compensated for any work he did for
M/A-COM.  As the Director of Human Resources for Support and
International Field Sales, Sullivan earned a lucrative salary that
was well over $125,000 per year, with additional bonus payments.
(PSR ¶ 76).  During the period from 1997 through 2001, Sullivan
was paid a total of approximately $664,411.00 in salary and
bonuses, plus he received numerous employee benefits.[2]  In fact,
from 2000 to 2001 alone, which were the last two years of the
scheme when Sullivan defrauded M/A-COM out of a total of
$209,283.33, he received a total of $293,945.00 in adjusted gross
income from his employer.[3]  Despite occupying a senior executive

---

[2]See copy of letter from Tyco International, Inc.'s counsel,
Arthur Hui, noting defendant's compensation package. (Attached hereto
as Exhibit 1, pg. 2).

[3]See PSR, ¶¶ 108, 108(a) indicating defendant's adjusted gross
income as reported to the Internal Revenue Service; and summary chart
illustrating amount of money Sullivan received from 1996 through 2001,
in checks that were made out to the fictitious individuals and
entities he purported to be in order to commit the fraud, attached

4

position, and as such, receiving a set salary with bonuses rather than working on an hourly basis, Sullivan claims that the loss amount should be decreased by $280,000, the value of services he provided from 5 to 7 AM, during late evening hours, and during weekends.[4] Sullivan asserts that he worked on projects for recruiting, advertising, and case research services. (Def.Sen.Mem. at 5).[5] Indeed, it is incredulous that Sullivan argues that he provided these services at a discount and that the company would have paid more if it had contracted the work out! Id.

The government submits that there is no evidence that M/A-COM benefitted in any way from the "extra" services that Sullivan claims to have provided during the fraud scheme. A general search and review of certain records and files by M/A-COM, failed to turn up any work produced by the defendant that would have merited any extra compensation.[6] Irregardless, even if Sullivan had performed

_____

hereto as Exhibit 2. A breakdown of the amounts of money that Sullivan received annually through his fraud scheme from M/A-COM is provided herein, attached as Exhibit 3.

[4]See Defendant's Sentencing Memorandum ("Def.Sen.Mem.") at 5.

[5]The type of work that Sullivan claims he performed and should be credited for, was work that was either performed by others at M/A-COM or that the company would specifically contract out. Jeffrey Howe, former Director of Human Resources and Sullivan's supervisor during the offense conduct has stated that Sullivan would not have been authorized to do recruiting or advertising and that no exempt employee got money for services above and beyond his or her normal work duties. (See Jeffrey Howe, Memo of Interview dated January 18, 2005, attached hereto as Exhibit 4 at pg. 2).

[6]Although a thorough search of records by M/A-COM was not feasible, as noted in the Government's Opposition to Defendant's Motion for Exculpatory Evidence, a general search was conducted of certain case files presumably worked on by Sullivan during the offense

any of the work he claims to have done, he is not entitled to any "extra" compensation, as he was already on M/A-COM's payroll in a salaried position and any work done by him was within the scope of his employment.  Furthermore, if Sullivan performed work that was outside the scope of his employment, such as developing "advertising themes" as he claims, it would constitute work he was not authorized to do and not within the scope of his employment. As Sullivan well knew, any work that he performed outside the scope of his employment, in an attempt to receive extra pay, was clearly a conflict of interest and in direct violation of the M/A-COM Code of Conduct.[7]  Given Sullivan's expertise in human resources and knowledge of company policy, he knew he had no right to any extra compensation.  That is probably one reason why he sought funds from his company through the commission of a fraud.

Sullivan wrongfully argues that "controlling case law" overwhelmingly supports his position that the amount of loss should be decreased by the value of services he provided to his employer. All of the cases he cites are clearly distinguishable from the facts in this case and deal with defendants in significantly different situations than that of Sullivan. (Def.Sen.Mem. at 3-4).

---

conduct, and no evidence of "work product" was found. (See letter by Kevin Kelleher, Director of Accounting, attached hereto as Exhibit 5).

[7]See excerpt from M/A-COM Code of Ethical Conduct ("Code") at 9, attached hereto as Exhibit 6, along with various acknowledgments signed by defendant.  Furthermore, the Code makes clear that violations of any standards can result in termination and prosecution in the courts. (Ex. 6 at 12).

In particular, Sullivan's reliance on <u>United States v.</u> <u>Redemann</u>, 205 F.Supp.2d 887 (E.D. Wisc. 2003), is completely misplaced as that case involved a defendant who was a labor contractor, who conspired to commit bank fraud by submitting inflated invoices for work he actually performed, that enhanced the property value of the bank. <u>Redemann</u>, 205 F.Supp.2d at 898. Unlike the case before the court, the defendant in <u>Redemann</u> did not occupy a management position nor was he a salaried employee of the victim bank. The court concluded that the $2.5 million loss that defendant was being held accountable for, overstated the severity of the offense where the defendant actually received only $806,447.48, of which $300,000 was estimated as the value for construction work he had done on the bank. <u>Redemann</u>, 205 F.Supp.2d at 898. In reaching this result, the court noted that the defendant in <u>Redemann</u> was, (1) recruited to participate in the fraud scheme; (2) did not control the amount of loss in the scheme, which was directed by the coconspirator; and (3) received a minuscule amount of the gain compared to the total amount taken. <u>Id</u>. at 899-900. Here, the facts are wholly inapposite to those in <u>Redemann</u>, given that Sullivan was an employee of the victim, directed the entire scheme, controlled the amount of loss, and solely received the full amount and benefit of the loss.[8] Sullivan,

---

[8]None of the cases Sullivan relies on to argue that the loss amount should be credited with the value of services rendered, relate to a defendant employee, engaged in a fraud upon their employer. See

7

who was a trusted employee and stood in a role model position as
Director of Human Resources for support services, should not be
credited in any way whatsoever for alleged services that he claims
he performed while defrauding his employer of over $700,000 from 1996
to 2001.

B. Restitution Should be Ordered in Full Amount
   of $692,696.57 and Should Not be Reduced by the
   Value of Sullivan's Previously Owned Stock Options

Sullivan's claim that the amount of restitution should be
further reduced by the value of his stock options should be
rejected. First, the defendant should not receive any credit for
the value of stock options that he received under false pretenses,
in light of the fact that unbeknownst to M/A-COM, he was defrauding
the company when it granted him the first set of stock options in
July 1996.[9]  Under the company's stock option plan, stock options
were awarded to certain key employees to encourage a proprietary
interest in the company, to provide added incentives to contribute
to the future growth and profitability of the company, and to

---

United States v. Sublett, 124 F.3d 693, 694 (5th Cir. 1997)(defendant,
who fraudulently procured government contracts, entitled to credit in
loss amount for legitimate counseling services provided under
contracts obtained); United States v. Palmer, 122 F.3d 215,221 (5th
Cir. 1997)(defendant engaged in telemarketing scheme, received a
reduction in loss amount for value of products received by victims);
United States v. Smith, 951 F.2d 1164, (where defendant fraudulently
obtained loans to build homes, no actual loss found due to security
interests in homes and no defaults on the loans had occurred).

[9] See Ex. 2, which indicates that first check issued pursuant to
fraudulent invoice submitted by Sullivan was 6/28/96.

attract and retain exceptionally qualified employees.[10]  If the
company had been aware of Sullivan's fraudulent scheme, it never
would have issued him stock options.

Secondly, there was no commitment from M/A-COM nor was the
defendant ever promised the opportunity to resign and to tender his
stock options to lessen the loss of the fraud to the company.
Sullivan misleads this Court by asserting that on December 11,
2001,  he  was  told  by  M/A-COM  executives,  Jeffrey  Howe
("Howe")(Director  of  Human  Resources)  and  Kevin  Kelleher
("Kelleher")(Director of Accounting) that if he was not kept on as
an employee, he would be allowed to resign and tender his stock
options and make other repayment. (Def.Sen.Mem. at 7).  In fact,
when Sullivan was first confronted on December 11th, he continued
to deceive his employer into believing that he had conducted
business with Economatrix and MBNA (non-existent companies), in
violation of company policy (i.e. it was against company rules to
be a vendor).[11]  Contrary to Sullivan's assertions that he was
"completely forthright" (PSR ¶ 23), he repeatedly told a series of
lies to Howe and Kelleher, among them that: (i) Economatrix was
opening an account; (ii) Sullivan knew Economatrix's address and
they had a federal tax Id; (iii) Carlos Reyes was the principal or

---

[10]See AMP Incorporated Nonqualified Stock Option Agreement
(Sullivan was employed by AMP, which was then acquired by M/A-COM),
attached hereto as Exhibit 7.

[11]See summary of notes taken by Jeffrey Howe of questions
responded to by Sullivan, attached hereto as Exhibit 8.

president of Economatrix; (iv) Economatrix International Limited,
Inc. was not registered, but he thought they were incorporated; (v)
Mail Box Direct National Advertising placed advertisements in
minority publications for them; (vi) Sullivan could provide a
contact at MBNA for them; (vii) Sullivan was involved with MBNA and
Economatrix; (viii) he started doing this over a year ago as a
service for a friend (in fact he had started the scheme well over
5 years prior); (ix) he had been paid about 80%-85% of what the
companies had received; (x) amount repayable was about $60,000; and
(xi) there were no other vendors with which he had a similar
arrangement. (Ex. 8). On that date, Sullivan was suspended and
told that the seriousness of the problem was grounds for
termination. It is clear that M/A-COM had no idea of the nature or
extent of the fraud that Sullivan perpetrated. Instead of
admitting to the full scope of the fraud, Sullivan lead Howe and
Kelleher to believe that he had been involved in a conflict of
interest situation involving $60,000. If the company had known the
truth on that date, it would have done what it had every right to
do - terminate Sullivan and extinguish his rights to all stock
options.[12]

    Furthermore, Sullivan misrepresents the conversation that
occurred on the following day, when he states that he was allowed
to repay M/A-COM by tendering his stock. Kelleher's notes make

---

[12]Stock options will terminate immediately upon termination of
employment, unless the "Committee" determines otherwise in its sole
discretion. (Ex. 7 at 3, 3.1).

clear that they would look into the feasibility of Sullivan's proposal, but they were not in any position of authority to make that determination.[13] All the stock options were frozen on December 11, and the company was in the process of assessing the situation. Although there is no question that Sullivan wanted to use his stock options to reduce the amount of loss, there was never any agreement to take such action by anyone empowered to make that decision at M/A-COM. Given Sullivan's experience in human resources and knowledge of company policy, it is inconceivable that he truly believed otherwise at this juncture. Although he claims that he could have exercised his stock options during the six weeks of his suspension and notice of termination, that is not exactly so, because the stock options were frozen as of December 11th. (Ex. 9). More importantly, if Sullivan had not deceived Howe and Kelleher on December 11th and, instead, revealed the true extent of the fraud, he would have been immediately terminated and his options would have expired.

It is amazing that Sullivan argues that as a matter of fairness and in the interests of justice, the restitution figure should be reduced by $532,028.18, the value of services he claims he provided and the value of the stock options. It seems he has lost sight of the fact that he betrayed his employer and received the options under false pretenses; deceived his co-workers; was

_____

[13]See copy of Kelleher's notes, attached hereto as Exhibit 9, and Ex. 4, Howe's Memorandum of Interview at 2.

11

evasive and untruthful when first confronted; and now continues to

exaggerate and misrepresent what happened.  In sum, it would be

completely unfair and unjust to the victim for this Court not to

order the entire amount of restitution, which is $692,696.57, and

which the defendant has the means to pay.

III.  <u>Sullivan's Sentence Recommendation is Unreasonable</u>
      <u>Pursuant to 18 U.S.C. § 3553(a)</u>

In <u>United States v. Booker</u>, 125 S.Ct. 738, 757 (2005), the

Supreme Court held that the Federal Sentencing Guidelines were no

longer mandatory, but were rather "advisory."  While district

courts are not bound to apply the Guidelines, they must consult

those Guidelines and take them into account when sentencing. Id. at

767.  In reaching a sentence that is appropriate and reasonable,

both the Guidelines and factors established in 18 U.S.C. § 3553(a)

are to be considered.  Sullivan has cited a series of factors which

he  claims  merit  a  sentence  that  in  effect,  constitutes  a

significant downward departure.  None of the factors Sullivan

relies on warrant such a result.

A.  <u>There has been no Extraordinary Acceptance</u>
    <u>of Responsibility by Sullivan</u>

Sullivan's acceptance of responsibility, in that he admitted

to his wrongdoing early on and agreed to plead guilty, has already

been  taken  into  account  by  a  three  point  reduction  in  the

calculation of the sentencing guideline range arrived at by the

Probation  Department.  (PSR  ¶  36).  Sullivan points to his

"forthright" confession to M/A-COM officials on December 11, 2001

12

and his post-offense conduct of offering to tender his stock
options as "extraordinary" acceptance of responsibility, that
demonstrate his individual characteristics and personal history.
(Def.Sen.Mem. at 11).

First, for reasons noted above, Sullivan was anything but
forthright when first confronted. (See Ex. 8). In fact, to make
such argument before this Court, given the summary of notes from
his meeting with Howe and Keller, indicates his continuing
deceptive nature. Sullivan exaggerates the context of his proffer
session on June 17, 2002 and tries to make much ado about his
admissions, claiming that he saved the government and Court the
resources needed to prepare for trial. (Def.Sen.Mem. at 11). This
entire argument defies the fact that he was caught red handed by
his company, and an internal investigation (including an audit)
left Sullivan with no escape. Secondly, his offer of stock options
was an empty one, in that he knew that upon termination for his
criminal conduct, he would lose them. More importantly, knowing he
had been scamming his company for more than 5 years, he also knew
he was not entitled to have them in the first place.

Sullivan should receive no positive consideration under this
factor. This is not a case where he, on his own, ended the fraud
and turned himself in. This is not a case where he immediately
told them he had fabricated numerous individuals and companies and
had submitted phony invoices for close to $750,000. This is not a
case where he has paid a penny of resitution. Instead, from the

13

outset, Sullivan has contested the loss on no valid or legitimate reason, sought to benefit from options he illegally obtained, and now, despite a plea agreement, relies on numerous "factors" to obtain a sentence that is significantly below what he deserves. There is nothing extraordinary, but rather questionable, about Sullivan's acceptance of responsibility.

    B.   <u>There was No Substantial Assistance or Cooperation by Sullivan that Merits a Reduction in His Sentence</u>

The government does not dispute that Sullivan attempted to provide substantial assistance, in that, he participated in two proffer sessions with prosecutors and then met on three separate occasions with Special Agent Joseph McGovern (Department of Transportation) to provide information. After consideration, a determination was made that Sullivan's information did not rise to the level of substantial assistance, and a motion for a §5k1.1 downward departure was not warranted.

Although Sullivan claims that he voluntarily cooperated and, indeed, exaggerates the degree of his cooperation by claiming that he met on a "regular basis" over the course of several months with government investigators, that in and of itself does not merit a lighter sentence in this case. There were no promises made to the defendant, and he was merely given an opportunity to provide substantial assistance.

    C.   <u>Sullivan's Post-Offense Rehabilitative Conduct and Lack of Potential Recidivism Are Not Worthy of a Sentence Reduction</u>

14

Sullivan argues that his post-offense conduct of becoming an EMT, volunteering part-time at Salem Hospital, and attempting to head to Sri Lanka to assist in the tsunami relief efforts, indicates rehabilitative conduct that merits a reduction in his sentence.[14] Although Sullivan claims that he has done all this because he wants to demonstrate his commitment to public service, there is no question that he is also motivated to put himself in the best light for sentencing.[15]

While getting a certification to be an EMT is a practical endeavor, it hardly qualifies as the great achievement Sullivan purports it to be. Additionally, his volunteering more time at the hospital, while a good deed, is also a result of extra time on his hands and his need to participate in activities that he hopes will garner him a lighter sentence. Furthermore, Sullivan's stated efforts to go to Sri Lanki and his attempt to make it appear as

_____

[14]Civic, charitable, public service related work, employment related work and record of prior good works are generally discouraged factors under the sentencing guidelines. §5H1.11.

[15]It is important to note that the First Circuit has stated that presence rehabilitation is usually taken into account in acceptance-of-responsibility credit, and that a downward departure is only given to defendants who demonstrate extraordinary presentence rehabilitation. United States v. Bogdan, 284 F.3d 324, 328, n.4 (1st Cir. 2002); See also United States v. Craven, 239 F.3d 91, 99 (1st Cir. 2001)("Craven I")("downward departures for pre-sentence rehabilitation are hen's-teeth rare, and our precedent makes clear that such departures should be granted sparingly"). This is so because pre-sentence rehabilitation "can be factored adequately into the sentencing equation by an acceptance-of-responsibility credit," Craven I, 239 F.3d at 99, and because "[s]ome degree of pre-sentence rehabilitation is usually to be expected from a penitent defendant, or one who genuinely shoulders responsibility, or even from one who simply wants to put his best foot forward at sentencing, hopeful of lightening the load." Id.

15

though he was specifically contacted by the United Nations
Volunteers to assist in the organization's relief efforts, doesn't
ring true.  A close reading of Def.Sen.Mem. Ex.9 indicates that a
general email went out seeking medical and healthcare volunteers,
and the defendant responded by filling out an application.  The
defendant was not individually signaled out, and in reality, would
not have been accepted if he had revealed his status as a convicted
felon awaiting sentence.[16]  Again, there is a degree of deception
in defendant's assertions that conflict with true, extraordinary
rehabilitative conduct.[17]

Finally, Sullivan's age and education should play no role in
reducing his sentence under the circumstances in this case.  Given
that the sentence imposed needs to reflect the seriousness of the
offense, to promote respect for the law, to provide just punishment
for the offense, and to afford adequate deterrence to criminal
conduct, §3553(a)(2)(A)&(B), only the sentence provided for in the
advisory guidelines (24-30 months imprisonment) accomplishes such
goals.  Sullivan's age do not prevent him from serving time in
prison and the fact that his age and education make it unlikely
that he will commit fraud again, do not control what is the most
reasonable sentence in this case.  Sullivan relies on United States

---

[16]See Government's Opposition to Defendant's Motion Requesting
Permission to Travel Outside of the United States.

[17]A clear example of defendant failing to right the wrongs he
committed pending sentencing is that there has been no claim by him
that he has filed amended tax returns and paid taxes due on the income
he received through his embezzlement.

v. Nellum, 2005 WL 300073 (N.D.Ind.), to support his position that
age, education and lack of recidivism are relevant to sentencing
determinations.  However, in Nellum, the court was dealing with a
57 year old defendant facing a term of 168 months of imprisonment.
In imposing a sentence of 108 months (a 4 level departure), the
court  cited  various  factors,  namely,  the  defendant's  "age,
likelihood of recidivism, his status as a veteran, his strong
family  ties,  his  medical  condition, and his serious drug
dependency..." Nellum, supra at 5.

> D.  Psychological Evaluation and Treatment Should Play
>     No Role in Sentence Imposed

Sullivan has provided a "draft" psychological evaluation by a
Doctor John Daignault, that is not signed. (Def.Sen.Mem. Ex. 10).
The evaluation describes Sullivan's good family upbringing, the
benefit of an education, and a successful employment history.  It
also reveals a very strong family network.  Further, it notes
certain family circumstances that weighed on the defendant, such as
the deaths of particular family members, the assistance in care
provided to a niece and parents.  While the evaluation portrays a
man who cares and provides for his family, and who has dealt with
different stresses in life, it in no way describes any exceptional
circumstances that warrant a departure from the sentence called for
by the guidelines.  The government submits that given its lack of
relevancy as a medical report, it is very likely that defendant
provided it to generate sympathy on his behalf.

More importantly, and probably more truthfully, is the information Sullivan provided to the U.S. Probation Department. In essence, he stated that his mental health has generally been satisfactory, and that he has never received a mental health diagnosis, treatment, or medication. (PSR ¶ 63). Although he claims that he has been "pretty depressed" over his current situation, this has not resulted in any clinical treatment or medication, and is understandable given the potential sentence and circumstances.

E. Sullivan's Family Circumstances Do Not Warrant A Reduced Sentence

Despite Sullivan's portrayal of a very supportive, loving family that is deeply concerned and afraid of what the future will bring if he is incarcerated, in no way does he establish any reason as to why his situation would be significantly different from others in his circumstances. In fact, his family's situation is in a much better posture than that of other defendants facing prison. Sullivan's wife appears to be in good physical health and she has a full time job. They have no children that are dependent on him warranting special care (PSR ¶¶ 56-57; 60(a)). Although there is a niece that he has taken care of for many years, she has a mother and stepfather, attends boarding school, and will still have the defendant's wife to care for her. Sullivan's mother-in-law also appears to be dependant on him, but she lives in his home and will have her daughter available to her.

18

Existing caselaw is unequivocal that being an exemplary parent or spouse is not sufficient to take a case out of the "heartland." United States v. Bogdan, 284 F.3d 324, 329 (1st Cir. 2002); citing United States v. Sweeting, 213 F.3d 95, 102 (3d Cir. 2000)(ruling that though defendant "appears devoted to her children and is a 'substantial influence' on their lives," no departure was warranted); United States v. Tejeda, 146 F.3d 84, 87 (2d Cir. 1998) ("The existence of a stable family (a wife and two children) - something that is by no means extraordinary - does not satisfy the 'exceptional hardship' criterion warranting family circumstances departure."); United States v. Bell, 974 F.2d 537, 538-39 (4th Cir. 1992)(holding that the defendant's role in helping to produce a stable family, and the fact that incarceration would likely disrupt his spousal and parental relationships, is insufficient to grant a downward departure); United States v. Shoupe, 929 F.2d 116, 121 (3d Cir. 1991)(ruling that a defendant who was a good father, regularly visited his child, and paid child support did not qualify as having an extraordinary family circumstance). Despite Sullivan's supportive family and their reliance on him, the facts in the present case simply do not present mitigating circumstances to a degree warranting a reduction in the sentence that is called for by the advisory guideline range. In the end, the defendant is an average white-collar criminal who committed an average white-collar crime.

19

IV.    Conclusion

For all of the reasons noted above the defendant's sentencing recommendation should be rejected and the sentence recommended by the government imposed. In support of the government's recommendation of 24 months imprisonment and the total restitution of $692,696.57, a victim-impact statement is provided to the Court.[18]

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    _Carmen M. Ortiz_
       Carmen M. Ortiz
       Assistant U.S. Attorney

Dated: March 23, 2005

---

[18]Attached hereto as Exhibit 10 is a letter dated March 22, 2005, signed by Kevin Kellerher, Director of Accounting at M/A-COM. which undersigned counsel received late this afternoon.

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below one copies of the Government's Sentencing Memorandum in Opposition to Defendant's Sentencing Memorandum, with attached Exhibits and the Government's Motion for Preliminary Order of Forfeiture by hand delivery:

        Stephen R. Delinsky, Esq.
        Eckert Seamans C&M, LLC
        1 International Place
        Boston, MA 02110

This 23rd day of March 2005.

                            Carmen M. Ortiz
                            Assistant U.S. Attorney

**tyco**

**Arthur P. Hui**
Associate Chief Litigation
Counsel

Tyco International (US) Inc.
9 Roszel Road
Princeton, NJ 08540

Tele: 609 720-4333
Fax: 609 720-4319

March 1, 2005

## BY TELECOPIER AND REGULAR MAIL DELIVERY

Carmen M. Ortiz
Assistant U.S. Attorney
United States Attorney's Office
District of Massachusetts
One Courthouse Way, Suite 9200
Boston, MA  02210

> Re:  United States v. James Sullivan
> CR No. 4-100183-MLW

Dear Ms. Ortiz:

I am writing to advise you that at your request, M/A-COM has reviewed certain documents and files in its Lowell, Massachusetts office and has not found any documents which were either signed by a "Carlos Reyes" or which were issued by an entity known as "Economatrix International Limited, Inc.", other than those previously provided to your office or to Postal Inspector William Ricker.

Please be advised that in its Lowell, Massachusetts office, M/A-COM has at least ten (10) full lateral file cabinet drawers each full of documents maintained by its H/R department during the period when the defendant Sullivan was the Director of Human Resources Support.  Further, M/A-COM has located a total of seventy-two (72) three by five inch diskettes which appear to have been used by the defendant during his employment.

These documents, and, potentially, the diskettes, contain personal information concerning current and former employees of M/A-COM, which information may well be protected from disclosure under federal or state privacy laws.  Further, to the extent these documents and diskettes contain information which is protected by the attorney-client privilege or which constitute work product, such information is likewise protected from disclosure.

It would be incredibly burdensome for the company to search through these file cabinets, which contain approximately 5,000 to 10,000 pages of documents, and through these diskettes to locate any "work papers" allegedly created by the defendant Sullivan as part of his scheme to defraud the company and to steal nearly $700,000.00 from M/A-COM.  For the defendant, a convicted felon who has admitted to creating false documents, now to argue that his "work papers" would accurately show the time

allegedly spent on "work" which benefited the company is to state the ridiculous. That the defendant seeks a credit or set-off for this alleged "work" against the amount of restitution to be imposed upon him calls to mind the boy who, prior to being sentenced for murdering his parents, cried out for mercy because he was an orphan.

It would also be incredibly burdensome for the company to search through these records and diskettes and prepare a privilege log identifying information which is privileged or work product.

During the period from 1997 through 2001, M/A-COM paid the defendant a total amount of approximately $664,411.00 in salary and bonuses. In addition to this monetary compensation, the defendant received traditional benefits such as health and life insurance, sick leave, annual leave, etc. The defendant thus received handsome compensation for any and all work which he performed for the company during that period. If the defendant did any other work which was not within his job description or duties, M/A-COM never authorized such work and the defendant was unqualified to do such work.

The Court should not countenance the defendant's attempt to once again victimize M/A-COM.

Should you have any questions, or require any additional information, please contact the undersigned.

Thank you for your assistance in this matter.

Very truly yours,

Arthur P. Hui

| | DATE | COMPANY NAME | CHECK NUMBER | AMOUNT | SUB-TOTALS | TOTAL |
|---|---|---|---|---|---|---|
| 1 | 8/23/2001 | ECONOMATRIX | | 31,061.25 | *funds frozen | |
| 2 | 6/7/2001 | , | #747400 | 24,761.25 | | |
| 3 | 7/12/2000 | , | #501203 | 19,220.00 | | |
| 4 | 2/1/2000 | | #001422 | 14,196.00 | | |
| | | | | | 89,238.50 | |
| 5 | 12/6/2001 | MBNA | #562748 | 22,050.00 | **voided ck | |
| 6 | 11/29/2001 | | #1173751 | 33,402.89 | | |
| 7 | 3/1/2001 | | #536846 | 39,183.00 | | |
| 8 | 10/2/2000 | | #520435 | 37,559.19 | | |
| 9 | 7/16/2000 | | #515367 | 40,961.00 | | |
| 10 | 10/1/1999 | | #469963 | 27,748.87 | | |
| 11 | 8/13/1999 | | #464850 | 39,504.00 | | |
| 12 | 6/7/1999 | | #001153 | 5,247.87 | | |
| 13 | 4/23/1999 | | #453307 | 26,805.00 | | |
| 14 | 4/6/1999 | | #000835 | 19,185.00 | | |
| 15 | 3/5/1999 | | #447597 | 13,118.44 | | |
| 16 | 2/5/1999 | | #444378 | 26,709.00 | | |
| 17 | 12/11/1998 | | #438113 | 26,709.90 | | |
| 18 | 11/6/1998 | | #434292 | 23,613.19 | | |
| 19 | 9/18/1998 | | #428819 | 24,412.25 | | |
| 20 | 6/5/1998 | | #415501 | 23,649.72 | | |
| 21 | 12/20/1996 | | #349170 | 18,475.00 | ***pre subpoena | |
| 22 | 6/28/1996 | | #328398 | 11,085.00 | *** | |
| | | | | | 459,419.32 | |
| 23 | 11/21/1997 | CSC CORPORATION INC | #389678 | 32,850.00 | | |
| 24 | 10/22/1997 | | #000700 | 24,300.00 | | |
| | | | | | 57,150.00 | |
| 25 | 3/3/1998 | WOODROW JAMES | #000809 | 36,000.00 | | |
| | | | | | 36,000.00 | |
| 26 | 9/11/1998 | EXECUTIVE RECRUITERS | #427752 | 25,000.00 | | |
| 27 | 8/7/1998 | GROUP | #423605 | 25,000.00 | | |
| | | | | | 50,000.00 | |
| 28 | 7/9/1999 | EXECUTIVE GROUP INC | #460851 | 20,000.00 | | |
| | | | | | 20,000.00 | |
| 29 | 7/11/1997 | APPELGATE EXECUTIVE SEARCH CONSULTANTS INC. | #372065 | 19,000.00 | | |
| | | | | | 19,000.00 | |
| 30 | 5/1/1998 | CHRISTIAN & TIMBERS INC. | #410299 | 15,000.00 | | |
| | | | | | 15,000.00 | |
| | | | | | | $745,807.82 |

```
* FUNDS FROZEN BY SOVEREIGN BANK        -31,061.25
**VOIDED CHECK - NOT DEPOSITED          -22,050.00   _____

                                                      53,111.25
TOTAL                                                              $692,696.57

***PRE-SUBPOENA CHECKS
```

| | UNITED STATES v. SULLIVAN | | | MONIES RECEIVED ANNUALLY FROM FRAUD | |
|---|---|---|---|---|---|
| NO. | YEAR | DATE | CHECK NO. | AMOUNT | YEARLY TOTALS |
| | | | | | |
| 1 | **1996** | 06-28-96 | 328398 | $11,085.00 | |
| 2 | | 12-20-96 | 349170 | $18,475.00 | **$29,560.00** |
| | | | | | |
| | | | | | |
| 3 | **1997** | 07-11-97 | 372065 | $19,000.00 | |
| 4 | | 10-22-97 | 000700 | $24,300.00 | |
| 5 | | 11-21-97 | 389678 | $32,850.00 | **$76,150.00** |
| | | | | | |
| | | | | | |
| 6 | **1998** | 03-03-98 | 000809 | $36,000.00 | |
| 7 | | 05-01-98 | 410299 | $15,000.00 | |
| 8 | | 06-05-98 | 415501 | $23,649.72 | |
| 9 | | 08-07-98 | 423605 | $25,000.00 | |
| 10 | | 09-11-98 | 427752 | $25,000.00 | |
| 11 | | 09-18-98 | 428819 | $24,412.25 | |
| 12 | | 11-06-98 | 434292 | $23,613.19 | |
| 13 | | 12-11-98 | 438113 | $26,709.90 | **$199,385.06** |
| | | | | | |
| | | | | | |
| 14 | **1999** | 02-05-99 | 444378 | $26,709.00 | |
| 15 | | 03-05-99 | 447597 | $13,118.44 | |
| 16 | | 04-06-99 | 000835 | $19,185.00 | |
| 17 | | 04-23-99 | 453307 | $26,805.00 | |
| 18 | | 06-07-99 | 001153 | $5,247.87 | |
| 19 | | 07-09-99 | 460851 | $20,000.00 | |
| 20 | | 08-13-99 | 464850 | $39,504.00 | |
| 21 | | 10-01-99 | 469963 | $27,748.87 | **$178,318.18** |
| | | | | | |
| | | | | | |
| 22 | **2000** | 02-01-00 | 001422 | $14,196.00 | |
| 23 | | 07-12-00 | 501203 | $19,220.00 | |
| 24 | | 07-16-00 | 515367 | $40,961.00 | |
| 25 | | 10-02-00 | 520435 | $37,559.19 | **$111,936.19** |
| | | | | | |
| | | | | | |
| 26 | **2001** | 03-01-01 | 536846 | $39,183.00 | |
| 27 | | 06-07-01 | 747400 | $24,761.25 | |
| 28 | | 08-23-01 | Unavailable | $31,061.25 | |
| 29 | | 11-29-01 | 1173751 | $33,402.89 | |
| 30 | | 12-06-01 | 562748 | $22,050.00 | **$150,458.39** |
| | | | | | |
| | | | | Grand Total | $745,807.82 |
| | | | | Funds Frozen 8/23/01 | $31,061.25 |
| | | | | Voided Check 12/6/01 | $22,050.00 |
| | | | | **Actual Monies Received 1996 - 2001** | **$692,696.57** |

## MEMORANDUM OF INTERVIEW

| | |
|---|---|
| PERSON INTERVIEWED | : Jeffrey Howe |
| DATE OF INTERVIEW | : January 18, 2005 |
| TIME OF INTERVIEW | : 4:00 – 5:20 p.m. |
| TYPE OF INTERVIEW | : Telephonic |
| INTERVIEWED BY | : Assistant U.S. Attorney, Carmen Ortiz |
| | And William Ricker, Postal Inspector |

Mr. Howe is the former Director of Human Resources and Administration for MA/Com. Mr. Howe worked for MA/Com for approximately thirteen years until April 2002. Mr. Howe left MA/Com when Tyco Electronics decided to contract the Human Resources function of MA/Com. Mr. Howe was James Sullivan's immediate superior at MA/Com. Mr. Howe currently works for Deluxe Corporation's NEBS Division. He is the Director of Compensation and Benefits for NEBS.

Mr. Howe stated that in December 2001, Mr. Sullivan was the Director of Human Resources. The Director of Human Resources was a senior Human Resource's employee and a peer of Howe's until Howe got promoted. He stated Mr. Sullivan was responsible for complex Human Resources areas such as international matters and settling of legal cases. Mr. Howe stated that he and Sullivan had a long history of mutual respect but they were not really friends and did not socialize.

At the time of the interview, Mr. Howe did not have the notes he had taken when he interviewed Mr. Sullivan in December 2001. His initial impression was that Mr. Sullivan admitted to submitting invoices to MA/Com that were fabricated by Mr. Sullivan. Mr. Howe's notes from December 11, 2001 were reviewed at this time. The notes state that at the time of the interview, Mr. Sullivan said that Economatrix was a legitimate company. They were opening an account, he knew their address but did not know their phone number and it had a federal tax ID. Mr. Sullivan further told Mr. Howe that Carlos Reyes did exist and was in charge of a company. Mr. Howe stated that at the time of his meeting with Mr. Sullivan officials at MA/Com thought the dollar losses to MA/Com were much lower than they actually were.

In the December 11 meeting with Mr. Sullivan, Mr. Howe stated they discussed lowering the amount of Mr. Sullivan's liability by producing advertisements that he billed to MA/Com. Mr. Sullivan told Mr. Howe that he could not provide these ads. During this meeting Mr. Howe's impression was that Sullivan said he was using an outside firm to provide services. Howe thought Sullivan was doing the work himself and billing the company as an outside vendor. Although Howe supported the idea of getting outside opinions or expertise, he did not believe that it was

03/23/2005  09:25  5086881112  ISTP POST  Page 27 of 41  PAGE  03
Case 1:04-cr-10161-MEW    Document 32    Filed 03/23/2005    Page 27 of 41

2

legitimate for Sullivan to get paid for these services. Howe stated that if Sullivan had presented the idea of Sullivan being paid for consulting work, this idea would have been rejected by the company.

In regard to Sullivan providing legal assistance services, Mr. Howe stated that no work product was provided by Mr. Sullivan.

Mr. Howe was asked whether Mr. Sullivan provided recruiting services for MA/Com and whether these services could reduce Mr. Sullivan's debt to MA/Com. Mr. Howe state this was the first time he'd ever heard that recruiting services were involved in Mr. Sullivan's attempt to reduce his debt. Mr. Howe stated that Sullivan was never authorized to do this. Howe stated that Jeff Chartier was the Employment Manager. It would have been Mr. Chartier's responsibility to do recruiting. Mr. Chartier reported to Sullivan. Mr. Howe stated this would have been outside the scope of Mr. Sullivan's employment. Mr. Howe stated that no MA/Com exempt employee got money for services above and beyond his normal work duties.

Howe was asked if Sullivan was responsible for developing advertising for recruitment. Mr. Howe stated this was outrageous because MA/Com had an advertising agency to perform this function. The name of this agency was the Byer Agency. This agency was on a retainer from MA/Com to provide this service.

Mr. Howe stated that to his knowledge Mr. Sullivan had attended law school, but he was unsure whether he ever graduated. Although MA/Com employees respected Sullivan's abilities in legal issues, this knowledge would not have justified additional compensation to Sullivan. Howe stated at best, it may have qualified Howe for some type of spot award.

Howe stated that he believe that if Sullivan received stock options during the time he was committing fraud, those options would not be valid. When Howe was asked if he had promised Sullivan that he could use his options to lower Sullivan's debt to MA/Com, Howe stated, "no way he was promised that would happen." Howe stated that the options question would have to be interpreted by people higher than Howe's position. Howe thought the 1996, 1998, and maybe the 1999 options were granted under AMP. The later ones were granted under Tyco. Howe believed the AMP options were vested but the Tyco ones were not. Mr. Howe was unsure what happens to the options if you were fired for cause. Mr. Howe thought that maybe he told Mr. Sullivan that they would consider the option but no promises were made.

Howe stated that he made no commitments as to whether Sullivan would be allowed to leave the company or would be fired. He stated he did not have the authority to make this decision. He stated "He had zero authority on the stock options, also." Howe stated the decision of whether to allow Sullivan to quit or be fired was up to Rick Hess. Howe stated Hess told him there was no way Sullivan was going to be treated as if he had quit the company. Howe stated Hess reported

to Tyco officials in Harrisburg, Pennsylvania. The decision on the termination of Mr. Sullivan was made by the Tyco legal team. This team was headed by Lucia Vallente.

Howe stated that Sullivan was notified that he would be terminated by a phone call in December 2001. Howe stated Mr. Kelleher was also present during this telephone call. During this call Sullivan was given two options regarding his termination. Howe stated that during this conversation, Sullivan was told that MA/Com would look into the feasibility of Sullivan using his stock options to make restitution to MA/Com, but no promises were made to Sullivan. Howe stated during this telephone call, Sullivan acknowledged that he was indebted to MA/Com and he agreed to cooperate with them. Sullivan requested that MA/Com inform his coworkers that he left the company for personal reasons.

Howe stated that he has run into Mr. Sullivan several times since they both left MA/Com. This was due to them both using the same outplacement source to look for a new job. Howe stated that during these meetings they did not talk about Mr. Sullivan's situation.

Mr. Howe was again asked whether Mr. Sullivan had been totally forthcoming with him. Howe stated that Sullivan initially admitted only a low dollar figure. Howe stated that Sullivan never admitted either the length or breadth of his actual scheme. He believes that Mr. Sullivan may have admitted between $160,000 and $200,000 in losses to MA/Com.



*Electronics*

**M/A-COM**

M/A-COM, Inc.
1011 Pawtucket Blvd.
Lowell, MA 01853-3295

March 1, 2005

Carmen M. Ortiz
Assistant U.S. Attorney, Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

Dear Mrs. Ortiz;

This letter is written to confirm that I examined the contents of twelve file cabinets (five
four-drawer and three five-drawer, three four-drawer and one three-drawer lateral file
cabinets) in an area containing former employee James Sullivan's files. I removed and
examined files labeled; CSC Corporation, Employment Based Litigation, Executive
Search, Hinds v. M/A-COM Antenna & Cable EEOC Charge # 161960328, Houmen
Mansour, Misc. Legal Draftings, Nathaniel Steward (two separate files), Renee Diette,
Robert (Bob) Stewart, Robert B. Stewart and Seijo-Custudio Carlos. I also reviewed
approximately one-hundred fifty-five items of correspondence.

My review disclosed no documents bearing the letterhead of "Econonmatrix" or Carlos
Reyes or any other markings indicating Econonmatrix or Carlos Reyes was the preparer or
source of information for the document. Further, I found no evidence of any form of
economic analysis of the cases. The most extensive file, Renee Diette, was contained in a
Foley, Hoag & Eliot LLP folder and includes documents generated by that firm.

Very Truly Yours,

Kevin M. Kelleher
Director of Accounting

Cc: A. Hui
    J. Varney

M/A-COM

Code
of
Ethical
Conduct

## CONTENTS

LETTER FROM THE PRESIDENT . . . . . i

OUR COMMITMENTS . . . . . . . . . . . . . 1

RESPONSIBILITIES . . . . . . . . . . . . . . 2
    General . . . . . . . . . . . . . . . . . . . . . . . 2
    The Company . . . . . . . . . . . . . . . . . 2
    Supervisors . . . . . . . . . . . . . . . . . . 2
    Employees . . . . . . . . . . . . . . . . . . . 3
    Others . . . . . . . . . . . . . . . . . . . . . . . . 3

STANDARDS    OF    CONDUCT
    Deal Fairly with Customers . . . . . . . . . . .
    Maintain Accurate Records . . . . . . . . . .
    Use Company Resources Properly . . . . .
    Do Not Abuse Your Position of Trust . . .

ACKNOWLEGEMENT . . . . . . . . . . . . . . .

HELP AND INFORMATION . . . . . . . . . . .

REPORT IMPROPER CONDUCT . . . . . . .

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . 12

Dear Fellow Employees:

M/A-COM wants to be known as a vigorous, focused company striving constantly toward excellence. Also, we want to be known as a company imbued with a genuine sense of fair play and integrity. These attributes are fundamental to our success.

It is one thing to philosophize about integrity or ethics, it is quite another to define these ideas. The literature in this pamphlet is designed to help us do just that. Please regard this as a code of conduct that each of us has a responsibility to observe. We expect you to read, understand, and adhere to the standards of conduct contained herein. If there is anything that you don't understand, please discuss it with your immediate supervisor who will, I'm sure, be able to help you.

If we all do these things well, there can be no doubt that we will be a success as individuals and as a corporation.

Thank you,

Thomas A. Vanderslice
*Chairman and*
*Chief Executive Officer*

i

## OUR COMMITMENTS

We at M/A-COM are dedicated to honesty and integrity in all our business activities. These traits are characterized by truthfulness and freedom from deception or fraud. We believe that high ethical standards are essential to achievement of our corporate goals. As such, we fully subscribe to the following commitments:

## TO OUR CUSTOMERS:

We shall place the highest priority on the value, quality and reliability of our products, and the service with which we support them.

## TO OUR SUPPLIERS:

We shall maintain open business dealings and shall emphasize fair competition and long-lasting relationships.

## TO OUR FELLOW EMPLOYEES:

We shall promote an environment that encourages new ideas, high quality work and professional growth.

We shall treat one another honestly and fairly; and we shall ensure equal opportunity for employment and advancement.

## TO OUR NEIGHBORS:

We shall act as responsible citizens, and in a moral and ethical manner, respecting laws and customs.

## TO OUR SHAREHOLDERS:

We shall conduct ourselves so as to enhance the reputation of the company. We shall pursue our growth and earnings objectives while keeping ethical standards at the forefront of our activities.

REV 1 — 6/90

1

## RESPONSIBILITIES

### General

The company and all employees are expected to observe a basic code of conduct in the workplace. Each of us must:

- Conduct our business in accordance with high ethical and moral standards.
- Observe recognized standards of fair dealing and personal integrity.
- Be dedicated and loyal to our company and our country.
- Be economical in utilizing company and customer resources.
- Neither commit, condone nor ratify any illegal or unethical acts for any reason.

### The Company

The company is responsible for making sure that all employees are aware of and understand the standards of conduct described in this booklet. The company is responsible for creating a work environment wherein these standards may be successfully followed. The company will provide education and training on ethical issues, and will make available continuing counsel on company rules and regulations to any employee who seeks it.

### Supervisors

Supervisors have certain responsibilities to the employees under their supervision. Supervisors should:

- Ensure that all current and new employees understand their responsibilities as described in this booklet.
- Periodically review the knowledge and understanding of this policy by employees under their supervision, and make sure that educational reinforcement is provided as necessary.
- Make their own personal commitment to these principles to ensure that their departments operate in accordance with the highest standards of conduct.

- Maintain a workplace environment that encourages open communications, free of the fear of reprisal regarding the upholding of the Standards.

### Employees

As a M/A-COM employee, you must conscientiously adhere to the standards contained herein and to the applicable laws and regulations of the country and other jurisdictions in which we operate.

Any employee who has knowledge of apparent infractions of these standards of conduct should immediately bring the matter to the attention of either his or her supervisor, the Office of the Corporate Counsel, or the Compliance Officer.

### Others

The Human Resources Department at each location is responsible to ensure that all new employees receive proper orientation in these standards, and to obtain acknowledgement of understanding from each employee.

The Internal Audit Department is responsible to perform reviews of compliance to these standards.

The Corporate Legal Department, with assistance of Human Resources and Internal Audit Department as appropriate, is responsible for the investigation of all reported violations of these standards.

The Compliance Officer is responsible to ensure implementation of the Ethics Program, to establish and maintain a program to train and educate all employees and to make periodic reports to the Chief Executive Officer on adherence to policy.

# STANDARDS OF CONDUCT

It is essential that every M/A-COM employee read and understand the following standards:

## Deal Fairly with Customers

*Selling and Marketing* — All information we provide relative to M/A-COM products should be clear and accurate. If, at any time, it becomes apparent that the company must engage in unethical or illegal activity to win a contract, that business will not be pursued further.

*Contract Negotiation* — In negotiating contracts, be accurate and complete in all representations. It is our responsibility to submit realistic proposals relative to cost, schedule and performance. The submission to a United States Government customer of a proposal, quotation or other document or statement that is false, incomplete or misleading can result in civil and/or criminal liability for the Corporation, the involved employee and supervisors who condone such a practice. In negotiating contracts with the Government, we have a duty to disclose current, accurate and complete cost and pricing data where required by law or regulation.

*Product Quality* — We are committed to developing, manufacturing and delivering quality products which meet all contractual obligations and M/A-COM quality standards. We will not deliver products that:

- are made from lower quality materials than those specified,
- are not properly tested,
- contain foreign-made materials when domestic materials are specified, or
- otherwise fail to meet contract specifications.

Documentation of tests must be accurate and truthful.

## Maintain Accurate Records

*Reporting of Time and Labor Charges* —

Employees who file timecards must be particularly careful to do so in a complete, accurate and timely manner, and to ensure that hours worked are applied to the account for which they were in fact incurred. No cost may be charged or allocated to a Government contract if the cost is unallowable by regulation or contract provision or is otherwise improper.

The employee's signature on a timecard is a personal representation that the timecard accurately reflects the number of hours worked on the specified project or job. The supervisor's signature is a representation that the timecard has been reviewed and that steps have been taken to confirm the validity of the hours reported and the correctness of the allocation of hours. Supervisors must never place pressures on subordinates that could lead them to believe that deviations from appropriate charging practices will be condoned.

*Pricing, Billing and Contracting* — Employees involved in any way in the pricing, billing or contracting functions have a special responsibility to understand and adhere to all applicable Government procurement regulations with regard to all aspects of the sale of products or services.

They must insure that cost accounting standards and principles of cost allowability are properly and consistently followed; and that all invoices to customers accurately reflect the product sold or services rendered, the true sales price, and terms of sale.

*Financial Records* — The records of our company are maintained in a manner that provides for an accurate and auditable accounting for all financial transactions in conformity with generally accepted accounting principles. No false or deceptive entries may be made for any reason. No undisclosed or unrecorded fund or asset may be established for any purpose. No payment may be made or approved with the understanding that it will or might be used for something other than the stated purpose.

REV 1 — 6/90

REV 1 — 6/90

*Expense Reports* — Business expenses properly incurred in performing company business must be adequately documented. By signing and submitting an expense report, the employee is affirming the validity of the claim. It is necessary to distinguish between travel expenses, business entertainment expenses, and alcoholic beverages on expense reports to comply with requirements of doing business with the United States Government.

## Use Company Resources Properly

*Political Contributions* — Our company believes strongly in the democratic political process and encourages employees to participate personally on their own time in that process. A corporation's activities, however, are limited significantly by law. For this reason, no political contribution of corporate funds or use of corporate property, services or other assets for political purposes may be made without the advance written approval of Corporate Counsel.

*Providing Business Courtesies to Customers* — Our success in the marketplace results from providing superior products and services at competitive prices. M/A-COM does not seek to gain improper advantage by offering business courtesies such as entertainment, meals, transportation or lodging. Employees should never offer any type of business courtesy to a customer for the purpose of obtaining favorable treatment or advantage.

To avoid even the appearance of impropriety, do not provide any customer with gifts or promotional items of more than nominal value.

Except for additional restrictions which apply to U.S. Government customers are are noted below, you may pay for reasonable meal, refreshment and/or entertainment expenses for customers that are incurred only occasionally, are not requested or solicited by the recipient, and are not intended to or likely to affect the recipient's business decisions with respect to M/A-COM. You may provide or pay

for a customer or supplier's travel or lodging expenses only with the advance approval of the corporate officer responsible for your group.

*U.S. Government Customers* — You may not provide or pay for any meal, refreshment, entertainment, travel or lodging expenses without the advance written approval of the Legal Department. State, local and foreign governmental bodies may also have restrictions on the provision of business courtesies, including meals and refreshments. If you do business with such government bodies, you are expected to know and respect all such restrictions.

*Dealing with Foreign Officials* — Do not promise, offer or make any payments in money, products or services to any foreign official in exchange for or in order to induce favorable business treatment or to affect any government decision. In some foreign countries, laws and customs may permit minor payments to clerical personnel to expedite performance of their duties. Such minor payments must never be made to gain or retain business.

*Hiring of Federal Employees* — Complex rules govern the recruitment and employment of U.S. Government employees in private industry. Prior clearance to discuss possible employment with, make offers to, or hire, any current or former Government employee, military or civilian, must be obtained from the Human Resources Deparrtent.

*Property and Equipment* — Employees must not use or allow the use of company property or equipment for activities other than in the normal course of company business. The company is often entrusted with Government or customer-furnished property and equipment. Such property must be used only for the purpose described in the contract to which it relates. It is not to be used for any other purpose without the specific written consent of the authorized customer representative.

## Do Not Abuse Your Position of Trust

M/A-COM respects your right to engage in activities outside of your employment or association with the company which are private in nature, do not conflict with, or adversely reflect upon the company or its image. M/A-COM expects you to devote your full working time and efforts to its interests and to avoid any activity that might detract from its interests. In particular:

*Conflict of Interest* — You may not have any employment, consulting, or other business relationship with a competitor, customer or supplier of M/A-COM, or invest in any competitor, customer or supplier of M/A-COM (except for moderate holdings of publicly-traded securities) unless you have the advance written permission of the corporate officer responsible for your group, after consultation with the Legal Department.

You may not carry on company business with a firm in which you or any near relative has an appreciable ownership or interest without express written approval of the corporate officer responsible for your group.

Outside employment may also constitute a conflict of interest if it places an employee in the position of appearing to represent M/A-COM, involves providing goods or services substantially similar to those M/A-COM provides, or lessens the efficiency, alertness or productivity normally expected of employees. All outside employment which raises any question in this regard must be approved in advance by the Legal Department.

*Antitrust Laws* — Under the Antitrust Laws, the Company must make its business decisions independently, and not as the result of any agreement or understanding with any of its competitors. Therefore, no individual shall enter into any understanding, agreement, plan, or scheme with any competitor in regard to prices, terms or conditions of sale, customers' bidding practices, discounts, or territories, nor shall any individual discuss or exchange such information or other such

competitive matters with any competitor. Violation of the law carries strict penalties, both for the Company and convicted individuals. This section is not a substitute for legal advice. Any questions on the interpretation of antitrust laws should be referred promptly to the Legal Department.

*Insider Trading* — Do not trade in the securities of M/A-COM or any other company, or buy or sell any property or assets, on the basis of non-public information you have acquired through your employment whether such information comes from M/A-COM or from another Company with which M/A-COM has a confidential relationship.

*Acceptance of Business Courtesies* — Never accept anything of value from someone doing business with M/A-COM where the gratuity is offered or appears to be offered in exchange for any type of favorable treatment or advantage. To avoid even the appearance of impropriety, do not accept any gifts or promotional items of more than nominal value. You may accept meals, drinks, or entertainment, if such courtesies are unsolicited, infrequently provided and reasonable in amount. Do not accept reimbursement for lodging or travel expenses, or free lodging or travel without the express written approval of the corporate officer responsible for your group.

*M/A-COM Proprietary and Private Information* — Do not disclose to any outside party, except as specifically authorized by management pursuant to established policy and procedures, any business, financial, planning, personnel, technological, or other information, which is trade secret, proprietary or private to M/A-COM, including customer-furnished data. Upon termination of employment, you may not copy, take or retain any documents containing such information. The prohibition against disclosing such information extends indefinitely beyond your period of employment. Your agreement to protect the confidentiality of such information in perpetuity is considered an important condition of your employment at M/A-COM.

8

REV 1 — 6/90

REV 1 — 6/90

9

***Government Classified and Proprietary Information*** — We have special obligations to comply with laws and regulations that protect classified information. Employees with valid security clearances who have access to classified information must ensure that such information is handled in accordance with pertinent federal procedures. These restrictions apply to any form of information, whether in written or electronic form. We shall not seek access to, accept or retain any classified material for which we have no need or entitlement.

M/A-COM does not solicit, nor will it receive, any sensitive proprietary internal Government information, including budgetary or program data, before it is available through normal processes.

## ACKNOWLEDGEMENT

After receiving a copy of this booklet, each employee will be asked to sign an Acknowlegement form which states:

"I have received, read and understand the M/A-COM Standards of Conduct and I will adhere to them."

## HELP AND INFORMATION

The company has designated a number of staff personnel to assist its employees in resolving any questions involving ethics and conduct. We should not hesitate to avail ourselves of this help.

- Any employee with a need for help or information regarding these standards is encouraged to take up that need with his or her immediate supervisor. If there is a reason why this is not appropriate, the employee should take the matter up with a representative of Human Resources or a company attorney.

- A representative of Human Resources shall be designated for each of the various company locations and shall be available for employee counseling and assistance with regard to these standards.

- Company attorneys shall be available to employees and management for assistance and information with regard to these standards.

- The Compliance Officer will be responsible for implementation of the Ethics Program and will make periodic reports to the Chief Executive Officer.

## REPORT IMPROPER CONDUCT

If it appears to any of us that a fellow employee may have violated any of the standards in this booklet, we should bring the matter to the attention of the fellow employee, when appropriate. If not appropriate, we are obligated to bring the matter to the attention of an appropriate supervisor, to the Compliance Officer, or to the Office of Corporate Counsel. As to a particularly serious matter not resolved by bringing it to the attention of the suspected employee, we are obligated to refer the matter directly to the Office of Corporate Counsel.

M/A-COM has established a "Hotline" to make direct reports in instances of improper conduct by the Company relating to its contracts or subcontracts with the U.S. Defense Department, including suspected instances of fraud, kickbacks, waste, and security violations. This "Hotline" may also be used to report other serious violations of the standards. Make "Hotline" reports by calling or writing the following:

Corporate Counsel
M/A-COM, Inc.
7 New England Executive Park
Burlington, MA 01803
(800) 333-0623

## SUMMARY

It is the objective of each of us, as well as the company, to operate according to the highest possible standards. As a result, we have a serious responsibility to ensure that our personal conduct is above reproach and, difficult as it may be at times, we also have obligations regarding the conduct of those who work around us. In cases where we suspect violations of the standards in this booklet, we should bring the matter to the attention of the apparent violator. If the matter is not resolved, we are obligated to bring it to an appropriate supervisor, the Compliance Officer, or directly to the Office of the Corporate Counsel. No adverse action or retribution of any kind will be taken against an employee because he or she reports a suspected violation or other irregularity. Such reports, as well as the identities of reporters and apparent violators, shall be treated confidentially to the maximum extent consistent with fair and rigorous enforcement of these standards.

Violations of these standards will not be tolerated, and will result in disciplinary action, from a warning up to suspension without pay, termination, or prosecution in the courts of law, as appropriate.

12

REV 1 — 6/90

---

**ACKNOWLEDGEMENT CARD**

I have received, read and understand the M/A-COM Standards of Conduct and I will adhere to them.

| EMPLOYEE NAME | EMPL. # | SOCIAL SECURITY # | DEPT. # |
| --- | --- | --- | --- |

DIVISION

DIVISION LOCATION

EMPLOYEE SIGNATURE

DATE

REV 1 — 6/90

## ACKNOWLEDGEMENT CARD

| EMPLOYEE NAME | EMPL. # | SOCIAL SECURITY # | DEPT. # |
|---|---|---|---|
| J. W. Sullivan | 16040 | 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 | HR4 |

I have received, read and understand the M/A-COM Code of Ethical Conduct and I will adhere to the standards set forth therein.

MED
DIVISION P.B.

DIVISION LOCATION

EMPLOYEE SIGNATURE                          11/3/95
                                            DATE

REV 2 - 9/94

---

## ACKNOWLEDGMENT CARD

I have received, read and understand the *AMP Global Code of Conduct* and its *Government Supplement* and I will adhere to the standards set forth therein.

_____
EMPLOYEE SIGNATURE                          11/2/95
                                            DATE

| EMPLOYEE NAME | EMP. # | SOCIAL SECURITY # | DEPT. # |
|---|---|---|---|
| James Sullivan | 16040 | 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 | |

Division H.R.        P.B.
OPERATING UNIT       OPERATING UNIT LOCATION

*Tyco*                                                    *Standards of Conduct*

ACKNOWLEDGEMENT FORM                                        ✓

*Please Read Carefully Before Signing*

I acknowledge that I have received a copy of Tyco's *Standards
of Conduct*, dated October 2000. I have read carefully and
understand the *Standards of Conduct* and I agree to abide by all
of these *Standards of Conduct* as a condition of my employment
and continued employment at Tyco. I understand that if I have
questions at any time concerning Tyco's Standards of Conduct,
I will consult with my immediate supervisor, my local human
resources representative, the general manager of my unit, or any
other member of senior management. If I am more comfortable
speaking with someone outside my business unit, I may call
Tyco's toll-free *ConcernLine* (800-714-1994)*, provided for this
purpose, which is accessible 7 days a week and 24 hours a day
from anywhere in the world. I may also contact Tyco's Corporate
Human Resources Department (603-778-9700) or Tyco's Legal
Department (212-424-1300).


J. SULLIVAN                    HR M/A-COM
Employee's Name                Unit


Employee's Signature

4/5/01                         EE # 19040
Date


*Sign, date and return this Acknowledgement to your local human
resources representative for inclusion in your employee file.*

Instructions for accessing the *ConcernLine* from outside the United States are provided at the end of the *Standards of Conduct*.