# AMP Incorporated

General Offices

Harrisburg, Pennsylvania

## NONQUALIFIED STOCK OPTION AGREEMENT



# AMP Incorporated

## NONQUALIFIED STOCK OPTION AGREEMENT

For the purpose of (a) encouraging key employees to acquire a proprietary interest in the Common Stock of AMP Incorporated (the "Corporation"), thereby aligning their interests with the interests of the shareholders, (b) providing added incentive to key employees to contribute to the future growth and profitability of the Corporation and (c) attracting and retaining exceptionally qualified employees, the Corporation, pursuant to the terms and conditions of the AMP Incorporated 1993 Long-Term Equity Incentive Plan (the "Plan"), will award Options to purchase Common Stock to certain participants.

The "Notice of Grant of Stock Options and Option Agreement" that was issued in conjunction with and hereby made a part of this Agreement specifies the number of Nonqualified Stock Options granted by the Committee to the therein-named employee (the "Participant"), the related Award Date, the applicable Exercise Price, and the applicable Exercise Period.

The grant, holding, and exercise of such Nonqualified Stock Options shall be subject to the terms and conditions of the Plan and the following:

### Article I. *Definitions.*

1.1. *"Agreement"* means this "Nonqualified Stock Option Agreement" in conjunction with the related "Notice of Grant of Stock Options and Option Agreement" between the Corporation and Participant.

1.2. *"Award"* shall mean any grant of Nonqualified Stock Options made to Participant under the Plan and this Agreement.

1.3. *"Award Date"* means the date designated by the Committee as of which Options are awarded to Participant under the Plan.

1.4. *"Board"* shall mean the Board of Directors of the Corporation.

1.5. *"Change in Control"* shall have the meaning set forth in Section 5.4 hereof.

1.6. *"Committee"* means the committee of the Board as described in Section 2(h) of the Plan.

1.7. *"Common Stock"* means common stock of the Corporation, no par value.

1.8. *"Competing Business"* means, as applied to a particular period of time, a business which at such time is engaged in the manufacture, sale or other disposition of a product or products which is in competition to a product or products of the Corporation or its subsidiaries, partnerships or joint ventures.

1.9. *"Corporation"* shall have the meaning set forth in the first paragraph of this Agreement.

1.10. *"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

1.11. *"Exercise Period"* means the period of time specified by the Committee on the Award Date and set forth in the related "Notice of Grant of Stock Options and Option Agreement" within which a Participant may exercise an Option, which period has been determined by the Committee pursuant to the Plan, subject however to the Committee's exercise of its discretion pursuant to Section 4.1 hereof and to the terms of Sections 3.1, 3.2 and 5.4 hereof.

1.12.   *"Exercise Price"* means the price specified by the Committee and set forth in the related "Notice of Grant of Stock Options and Option Agreement" at which the Participant may exercise an Option during the Exercise Period, which price has been determined by the Committee pursuant to the Plan.

1.13.   *"Fair Market Value"* means the closing sales price of a Share as reflected on the New York Stock Exchange Composite Tape for the relevant date.

1.14.   *"Nonqualified Stock Option"* or "Option" means a right granted under the Plan and this Agreement to purchase a single Share at a specified Exercise Price within a specified Exercise Period, which right is not intended to be an incentive stock option meeting the requirements of Section 422 of the Internal Revenue Code of 1986 or does not qualify as an incentive stock option.

1.15.   *"Participant"* shall have the meaning set forth in the second paragraph of this Agreement.

1.16.   *"Securities Act"* means the Securities Act of 1933, as amended.

1.17.   *"Share"* or *"Shares"* means a share or shares of Common Stock.

1.18.   *"Termination of Employment"* means the termination of employment by the Corporation or by a subsidiary, but not the transfer of employment from the Corporation to a subsidiary of the Corporation or vice versa or from one subsidiary of the Corporation to another such subsidiary. If the Committee in its sole discretion so determines, employment shall not be considered as terminated for the purposes of Section 3.1 so long as Participant continues to perform services for the Corporation or a subsidiary thereof on either a full or part time basis either as an independent contractor or on a consulting basis or otherwise, provided, however, that Participant during such period does not, whether full time or part time, engage in or perform any services as an employee, independent contractor, consultant, advisor, or otherwise for a Competing Business.

## Article II. *Exercise of Options.*

2.1.   *"Person Eligible to Exercise":* During Participant's lifetime, only Participant or, in the event of disability, Participant's guardian or legal representative may exercise an Option granted under the Plan. After the death of Participant, any Options held by Participant prior to death that continue to be exercisable may be exercised by Participant's personal representative or by any person empowered to do so by will or by the laws of descent and distribution. The terms of the Plan and this Agreement, as well as the interpretations and decisions of the Committee, shall be binding upon any such guardian, legal representative, personal representative, or other person acting on behalf or in lieu of the Participant.

2.2.   *"Manner of Exercise":* Participant may exercise an Option on any business day of the Corporation within the Exercise Period by delivery to the Secretary of the Corporation at the Corporation's principal office, either by mail, facsimile, or in person, of a properly completed notice of exercise, on a form approved by the Secretary, together with full payment of the aggregate Exercise Price and the Federal, state and local tax withholding obligation as provided in Sections 2.3 and 5.1 hereof. The date such form is received by the Secretary shall be the date of exercise. Such form shall specify the Participant, Participant's Social Security number, the Award Date, the number of the Options being exercised, the aggregate Exercise Price, and the manner in which the Participant intends to satisfy the resultant tax withholding obligation. The minimum number of Options that may be exercised at any one time shall be 100 or, if less, the aggregate number of outstanding Options then credited to Participant and exercisable. In the event the Option is being exercised pursuant to Section 2.1 by any person other than Participant, such person shall also submit at the time of exercise satisfactory proof of the right of such person to exercise the Option.

2.3.   *"Payment and Issuance":* Shares acquired pursuant to the exercise of Options shall be paid for in full at the time of exercise, either in the form of cash, Common Stock (whether by previously owned Shares or by having the Corporation withhold a portion of the Shares to be received) having a value based on Fair Market Value on the date of exercise equal to the aggregate Exercise Price, or in a combination thereof, as the Committee may determine. Any election to have the Corporation withhold Shares to be received under the Plan and this Agreement for the purpose of paying the Exercise Price will

be subject to such restrictions as the Committee, in its discretion, may hereafter determine. A certificate for the net amount of Shares attributable to an exercise shall be issued to Participant as soon as practicable following payment of the aggregate Exercise Price and all applicable withholding taxes.

2.4. **"Non-Registration"**: In the event the Shares to be issued hereunder upon the exercise of an Option have not been registered under the Securities Act or a registration is not then currently effective with respect to such Shares, the Participant shall deliver to the Corporation, as a condition to the exercise of any Option awarded under this Agreement, at the time of such exercise, a bona fide written representation and agreement, in a form satisfactory to the Committee, signed by Participant or other person then entitled to exercise such Option, stating that the Shares are being acquired for his or her own account, for investment and without any present intention of distribution or reselling said Shares, or any of them, except as may be permitted under the Securities Act and then applicable rules and regulations thereunder, and that Participant or other person then entitled to exercise such Option will indemnify the Corporation against and hold it free and harmless from any loss, damages, expense or liability resulting to the Corporation if any sale or distribution of the Shares by such person is contrary to the representation and agreement referred to above. The Committee may take whatever additional actions it reasonably deems appropriate to ensure the observance and performance of such representation and agreement and to effect compliance with the Securities Act and any other Federal or state securities laws or regulations, including but not limited to Rule 144 promulgated under the Securities Act. Without limiting the generality of the foregoing, the Committee may require an opinion of counsel acceptable to it to the effect that any subsequent transfer of Shares acquired on an Option exercise does not violate the Securities Act, and may issue stop-transfer orders covering such Shares. Share certificates evidencing Shares issued on exercise of such Option shall bear an appropriate legend referring to the provisions of this Section and the agreements herein.

### Article III. Termination of Employment.

3.1. **"Rights Upon Termination of Employment"**: In the event that Participant experiences a Termination of Employment for any cause, all Options will terminate immediately or as the Committee may determine in its sole discretion. In the event an Option is continued beyond a Termination of Employment, in no event will it be continued beyond the end of the Exercise Period specified in this Agreement.

3.2. **"Fulfillment of Conditions"**: Any extension by the Committee of the term of an Option beyond the date of a Termination of Employment shall be contingent on such conditions as the Committee, in its sole discretion, may determine, including but not limited to the fulfillment of the conditions that:

(a) Participant shall not, whether full time or part time, as an employee, on a consulting or advisory basis or otherwise, engage in or perform any services during the period between the date of Participant's Termination of Employment and the date of Participant's exercise and payment of the extended Option for a business which at such time shall be a Competing Business, nor shall Participant at any time (i) disclose information relative to the business of the Corporation and its subsidiaries which is confidential or (ii) otherwise act or conduct himself in a manner which is inimical or contrary to the best interest of the Corporation and its subsidiaries, and

(b) The Participant shall be available during the period between the date of Participant's Termination of Employment and the date of Participant's exercise and payment of the extended Option for such consulting and advisory services as the Corporation or its subsidiaries may reasonably request, taking fairly into consideration the age, health, residence and individual circumstances of the Participant and the total value of the Options held by the Participant under the Plan during the Exercise Period.

In the event that any of such conditions shall not be fulfilled, the obligations of the Corporation hereunder shall forthwith terminate, as shall the extension of the terms of any Options hereunder; provided that any such cancellation shall be in addition to and not in lieu of any of the rights or remedies available to the Corporation or its subsidiaries arising out of Participant's breach of any provision of this Agreement or the Plan. Ownership as a passive investor of not more than five percent (5%) of the outstanding shares of the stock of any company listed on a national securities exchange or having at least one hundred (100) shareholders of record shall not in itself be deemed a nonfulfillment of the conditions herein set forth.

## Article IV. *Administration of Plan.*

4.1. *"Committee"*: The Committee shall administer the Plan and this Agreement in accordance with their provisions and shall have full and final authority in its discretion to (a) interpret the provisions of the Plan and this Agreement and decide all questions of fact arising in their application, and its interpretations and decisions shall be in all respects final, conclusive and binding; and (b) make all other determinations, rules and regulations necessary or advisable for the administration of the Plan and this Agreement. Notwithstanding any provisions of this Agreement to the contrary, the Committee shall have the power to permit, in its discretion, an acceleration of any previously determined Option exercise terms or to otherwise amend the terms of an Option, under such circumstances and upon such modified or different terms and conditions as it deems appropriate, subject, however, to the provisions of the Plan. No member of the Committee shall be personally liable for any action or determination in respect to the administration of the Plan and this Agreement if made in good faith.

## Article V. *Miscellaneous.*

5.1. *"Withholding of Taxes"*: Whenever the Corporation proposes or is required to issue or transfer Shares under the Plan and this Agreement, the Corporation shall have the right to require Participant to remit to the Corporation an amount sufficient to satisfy any Federal, state and/or local withholding tax requirements prior to the delivery of any certificate or certificates for such Shares. Withholding requirements may be satisfied by cash payments or, at the election of Participant, by having the Corporation withhold a portion of the Shares to be received, or by delivering previously owned Shares, having a value equal to the amount to be withheld (or such portion thereof as the Participant may elect). Any election to have Shares withheld under this Section may be subject, in the Committee's discretion, to such restrictions as the Committee may determine, including but not limited to one or more of the following restrictions in accordance with Section 16(b) of the Exchange Act: (a) the election shall be irrevocable; (b) the election shall be subject, in whole or in part, to the approval of the Committee and to such rules as it may adopt; (c) the election must be made at least six months prior to the transfer of Shares under the Plan and this Agreement; and (d) the election shall be made during the time period specified in Rule 16b-3(e) promulgated under the Exchange Act, or any successor rule or regulation thereto.

5.2. *"Non-Alienation of Benefits"*: Prior to its settlement in the form of Shares, no right or benefit under the Plan and this Agreement shall be subject to anticipation, alienation, sale, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, assign, pledge, encumber or charge the same whether voluntary, involuntary or by operation of law, shall be void except by will or by the laws of descent and distribution or by such other means as the Committee may approve from time to time. No right or benefit under the Plan and this Agreement shall in any manner be liable for or subject to the debts, contracts, liabilities, or torts of the person entitled to such benefit. If Participant should become bankrupt or attempt to anticipate, alienate, sell, assign, pledge, encumber or charge any right or benefit under the Plan and this Agreement, then such right or benefit shall, in the sole discretion of the Committee, cease and terminate, and in such event, the Corporation may hold or apply the same or any part thereof for the benefit of Participant, the Participant's spouse, children or other dependents, or any of them, in such manner and in such proportion as the Committee may determine. Any restrictions on transferability of the Shares either described above or otherwise provided for in this Agreement may be referred to in legends contained on the certificates evidencing such Shares.

5.3. *"Legal Holiday"*: If and when the date on which a computation or distribution is to be made or other action is to be taken under the Plan or this Agreement falls on a Saturday, Sunday, or a legal holiday, such computation or distribution shall be made or such other action taken on the next succeeding business day.

5.4 *"Change in Control"*: For the purposes of this Section, "Change in Control" shall have the meaning assigned to it in Section 10 of the Plan. Notwithstanding any provisions hereof to the contrary, upon the occurrence of a Change in Control, all Options granted under the Plan and this Agreement that are unexercised and unexpired shall become immediately and automatically vested for the period of their remaining terms, without any further action by the Committee.

5.5. *"General Restrictions"*: The Plan and each Award under the Plan and this Agreement and the issuance or purchase of Shares in connection therewith shall be subject to the condition that, if at any time the Committee shall determine that the Plan, this Agreement, an Award under the Plan and this Agreement or the issuance or purchase of Shares in connection therewith requires or it is desirable that it has (a) the listing, registration or qualification of the Shares subject or related to the Plan upon any securities exchange or under any state or Federal law or under the rules and regulations of the Securities

4

and Exchange Commission or any other governmental regulatory body, or (b) the consent or approval of any governmental regulatory body, or (c) an agreement by the recipient of an Award with respect to the disposition of Shares, then the Plan and this Agreement will not be effective and the Award may not be consummated in whole or in part unless such listing, registration, qualification, consent, approval or agreement shall have been effected or obtained free of any conditions not acceptable to the Committee.

5.6. *"Rights of a Shareholder"*: The recipient of any Award under the Plan and this Agreement, and any person claiming under or through such recipient or under the Plan or this Agreement, shall not be, nor have any of the rights of, a shareholder with respect thereto, nor shall they have any right or interest in any cash or other property, unless and until certificates for Shares are issued to such Participant after compliance with all the terms and conditions of the Plan and this Agreement.

5.7. *"Rights to Terminate Employment"*: Nothing in the Plan or this Agreement shall confer upon Participant the right to continue in the employment of the Corporation, or to continue in any position or at any level of remuneration, or affect any right which the Corporation may have to terminate the employment of such Participant for any reason whatsoever, with or without good cause.

5.8. *"Management, Accounting and Financial Decisions"*: Nothing in the Plan or this Agreement shall affect the authority of the management of the Corporation to make management, business, accounting and financial decisions concerning the Corporation.

5.9. *"Non-Uniform Determinations"*: The Committee's determinations under the Plan (including without limitation determinations of the persons to receive Awards, the form, amount and timing of such Awards, the terms and provisions of such Awards and the agreements evidencing same, and the establishment of values and performance targets) need not be uniform and may be made by the Committee selectively among persons who receive, or are eligible to receive, Awards under the Plan, whether or not such persons are similarly situated.

5.10. *"Adjustments"*: In the event of any change in the outstanding Shares by reason of a stock dividend or distribution, recapitalization, merger, consolidation, split-up, combination, exchange of shares or the like, the Committee shall adjust the maximum number of Shares which may be issued under the Plan and shall provide for an equitable adjustment of any outstanding and unexercised Award or any Shares issuable pursuant to an outstanding and unexercised Award under the Plan and this Agreement, to the end that after such event the Participant's proportionate interest shall be maintained as before the occurrence of such event. The decision of the Committee with respect to the nature and amount of the adjustment(s) shall be conclusive and binding upon Participant and all persons claiming under or through Participant or under the Plan or this Agreement.

5.11. *"Delegation"*: The Committee may delegate to one or more officers or managers of the Corporation, or a committee of such officers or managers, the authority, subject to such terms and limitations as the Committee shall determine, to: (a) grant Awards to participants under the Plan; (b) cancel, modify, or waive rights with respect to participants under the Plan; or (c) alter, discontinue, suspend, or terminate Awards held by participants under the Plan; provided, however, that no such participant shall be an officer, director or ten percent shareholder of the Corporation within the meaning of those terms under Section 16 of the Exchange Act.

5.12. *"Amendment"*: The Board may amend, suspend or terminate the Plan at any time or from time to time, except that no amendment shall be effective without shareholder approval if shareholder approval of such amendment, suspension or termination would be required in order to ensure that the Plan, as amended, would continue to meet the requirements of Rule 16b-3 promulgated under the Exchange Act, or any successor rule or regulation thereto. Except as may be provided in this Agreement, the termination or any modification or amendment of the Plan shall not, without the consent of Participant, affect Participant's rights under an Award previously granted.

5.13. *"Effect on Other Plans"*: Nothing in the Plan or this Agreement shall be construed to limit the right of the Corporation to establish any other forms of incentives or compensation for employees of the Corporation or to grant or assume options otherwise than under the Plan or this Agreement in connection with any proper corporate purpose.

5

5.14. *"Duration of the Agreement":* This Agreement shall remain in effect until all Awards under this Agreement either have been satisfied by the issuance of Shares or have expired or been forfeited by their terms.

5.15. *"Funding of the Plan":* The Plan shall be unfunded. The Corporation shall not be required to establish any special or separate fund or to make any other segregation of assets to assure the payment of any Award under the Plan or this Agreement, and payment of Awards shall be subordinate to the claims of the Corporation's general creditors.

5.16. *"Severability":* If any provision of the Plan or this Agreement or any Award is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction, or as to any person or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to applicable laws, or if it cannot be so construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction, person, or Award, and the remainder of the Plan and this Agreement and any such Award shall remain in full force and effect.

5.17. *"Construction":* Wherever any words are used in the Plan or this Agreement in the masculine gender they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever any words are used herein in the singular form they shall be construed as though they were also used in the plural form in all cases where they would so apply.

5.18. *"Headings":* Headings are given to the Sections and subsections of the Plan and this Agreement solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of the Plan or this Agreement or any provision thereof.

5.19. *"Governing Law":* The validity, construction and effect of the Plan and this Agreement and any rules and regulations relating to the Plan and this Agreement shall be determined in accordance with the laws of the Commonwealth of Pennsylvania and applicable Federal law.

* * *

Dated and executed as evidenced on the related "Notice of Grant of Stock Options and Option Agreement" issued in conjunction with and made a part of this Agreement.

## Privileged and Confidential Prepared at the Request of Counsel

Questions of James W. Sullivan Tuesday, December 11, 2001 (2:15 pm)

By: Kevin Kelleher, Financial Controller, M/A-COM - questioner
    Jeffrey Howe, HR Director, M/A-COM and Mr. Sullivan's boss

Notes prepared by Jeffrey Howe

The following questions were asked of Mr. Sullivan in the order listed.

Are you aware that an attempt was made to deposit our check number 554798 in the amount of $31,061.25 and payable to Economatrix into a bank account owned by an individual or entity that is not Economatrix?
**A: Yes**

Do you know why someone attempted to make this deposit?
**A: There was no other account to put it in.**

Do you know what Economatrix is doing to resolve this situation?
**A: They are opening an account.**

Does M/A-COM have a written service agreement with Economatrix?
**A: No**

Do you have a current address, phone number and federal tax identification number for Economatrix?
**A: I know the address but not the phone number. They have a federal tax ID**

What can you tell us about Carlos Reyes and his affiliation with Economatrix?
**A: He is the Principal or President for the business.**

Do you have a current address, phone number for Carlos Reyes?
**A: Yes**

How do you explain the fact that the address and phone number listed on the Economatrix invoices are for another firm?
**A: I can't explain this.**

How do you explain the fact that there is no firm licensed to do business in Florida by the name of Economatrix International Limited, Inc. or any reasonable facsimile thereof?
**A: They are not registered to do business but thinks they are incorporated now.**

What is the nature of the services provided to M/A-COM by Mail Box Direct National Advertising?
**A: They place advertisements in minority publications for us.**

Does M/A-COM have a written service agreement or purchase order for these services?
**A: No**

Do you have a current address, phone number and federal tax identification number for MBNA?
**A: No**

Can you give us the name of your contact at MBNA?
**A: Yes**

How do you explain that there is no phone listing for Mail Box Direct National Advertising at the address listed on their invoice?
**A: I can't**

How do you explain that there is no company licensed to do business anywhere in the United States by the name of Mail Box Direct National Advertising or any reasonable facsimile thereof?
**A: I am involved with this.**

How do you explain the fact that M/A-COM checks payable to both Economatrix and MBNA have been deposited to the same bank account?
**A: I am involved with both organizations.**

Are the owner, holder or have any interest in or control over Soverign Bank account no. 621000760827?
**A: I am involved with the account.**

Have you or anyone on your behalf deposited a check issued by M/A-COM to Soverign Bank account no. 621000760827?
**A: Yes**

**General Discussion following the formal questions**

Mr. Sullivan admitted to his involvement with both companies and his lack of judgment in doing so while employed by M/A-COM. He said he did profit personally from the arrangement.

He said this had started over a year ago as a service for a friend. He said he should have known better to be a self vendor while working for M/A-COM. He felt that despite the inexcusability of his actions he did feel that valuable service was provided to M/A-COM

as a result of the arrangement with Economatrix, that in total the Company had saved money overall compared to handling these cases through other means.

He acknowledged that his actions were in direct conflict with many company documents he has signed in the past such as the Tyco Standards of Conduct. He said he had no prior written or verbal authorizations from any manager or executive that he could produce in which he had had permission to conduct business in this manner. He took a risk and he was sorry.

He was asked about the services provided by these companies and how much of the total cost he had profited from. He indicated that he had been paid about 80% - 85% of the total Economatrix billing since he did most of the work. He thought that about 25% of the MBNA billing had been paid to him. Based on Mr. Sullivan's statements at the meeting it was determined that the amount repayable was about $60,000 of the total checks cashed. He indicated that there were no other vendors with which he had had a similar arrangement and that the checks payable to these two vendors that were in question were all generated in 2000 and 2001.

He was informed that the seriousness of the problem was grounds for termination which he acknowledged. He was told that he would be suspended effective today. He was told he should prepare a written explanation of the circumstances surrounding the questions asked of him. He was presented with the possibility of resigning. He said he did not want to have to do this. Rather he hopes that his numerous years of dedicated service and value to the company would be considered in the determination of his status.

When told that he would have to repay the company Mr. Sullivan said he would have to continue to work to do so. He hoped that this could be as a continued M/A-COM employee and have the amount payable deducted from his pay.

Mr. Sullivan was cooperative in resolving open issues with respect to this matter. He said he would help resolve open issues surrounding the uncashed $31,061.25 check payable to Economatrix if necessary.

He turned in his badge and was escorted from the building. I (Jeff Howe) told him I would discuss all the aspects of the matter and his comments with Rick Hess, President and let him know on Wednesday afternoon (12/12) as to how the company wants to proceed in this matter. I asked him to think further about resigning.

## Privileged and Confidential Prepared at the Request of Counsel

Kevin Kelleher's notes on Jeff Howe phone conversation with James Sullivan on December 12, 2001, approximately 3:15 p.m.

The purpose of the phone conversation was to inform Mr. Sullivan that M/A-COM elected to terminate his employment and to briefly discuss the two options for the termination. These are:

1) Mr. Sullivan can make restitution to M/A-COM for the total amount of funds received by him, less any amounts paid to bona fide third party suppliers for goods or services actually delivered to M/A-COM, and M/A-COM will agree to accept his resignation. Mr. Sullivan will be allowed to exercise Tyco International stock options to the extent required to discharge this liability and will be allowed to exercise any remaining options for personal gain in accordance with the provisions that apply upon resignation once the liability is repaid (all stock options were frozen on December 11).

2) Mr. Sullivan can choose to not make restitution and M/A-COM will terminate for cause and pursue such other actions as it deems necessary.

The phone conversation began with Mr. Howe informing Mr. Sullivan of M/A-COM's decision to sever its relationship with him and the two options available to Mr. Sullivan. Mr. Sullivan acknowledged that he understood both the decision and the alternatives. Mr. Sullivan stated that he wished that his termination be deemed a resignation and agreed to repay the company the full amount of the monies received by him. Mr. Sullivan acknowledged that it is his responsibility to produce receipts for any expenditures he made to bona fide third party vendors for which M/A-COM received demonstrated benefit and stated that he does not have any records of these transactions and will reimburse M/A-COM for the full amount that we state is due (pending further review this is $156,660.44).

Mr. Sullivan next inquired about the feasibility of assigning any rights he might have in the stock options to Tyco and Tyco exercising. He stated that he believes this may provide a tax benefit to the company and additional assurance that his debt will be discharged. He also stated that the options are his only means of repaying this debt and that he wished to complete the exercise as quickly as possible in order to avoid any risk of a diminution in the stock price. There was some discussion on this inquiry and it was agreed that M/A-COM would inquire about the feasibility of this proposal.

Next there was a discussion about the communications explaining Mr. Sullivan's sudden departure from the company. Mr. Sullivan requested that the general explanation be that he left the company for personal reasons. Mr. Howe agreed.

Mr. Sullivan agreed to cooperate to the fullest extent possible in the transition of his work and a meeting for this purpose and to allow Mr. Sullivan to obtain his personal belongings from his office was tentatively set for 9:00 a.m. on Saturday, December 15 at M/A-COM's Pawtucket Boulevard facility.

End of Notes.

**tyco**
**Electronics**

**M/A-COM**

John Varney
Assistant General Counsel
Tyco Electronics
C/o M/A-COM, Inc.
1011 Pawtucket Boulevard
Lowell, MA 01854
U.S.A.

Phone (978) 442-4101
Fax (978) 442-5355

March 22, 2005

**BY TELECOPIER AND FEDERAL EXPRESS DELIVERY**

Ms. Kathleen Griffin
United States Attorney's Office
District of Massachusetts
One Courthouse Way, Suite 9200
Boston, MA 02210

    Re: United States v. James Sullivan
        CR No. 4-100183-MLW

Dear Ms. Griffin:

    I am writing on behalf of M/A-COM, Inc. ("M/A-COM") to submit this Victim Impact Statement in connection with the above-captioned criminal case. M/A-COM is the victim of the defendant James Sullivan's financial crimes for which he will be sentenced on March 30, 2005. Justice will not be complete until the Court sentences the defendant to a lengthy period of incarceration and to pay restitution immediately to M/A-COM in the full amount of the $692,696.57 which the defendant stole from the company.

BACKGROUND

    M/A-COM is a Lowell, Massachusetts based company that has been in business since 1950. The company was founded as Microwave Associates by four engineers in a small rented office on Columbus Avenue in Boston. The company's name was changed to M/A-COM, Inc in 1978. The company's early focus was on the emerging semiconductor business, supporting the defense industry and commercial markets. M/A-COM has broadened its technology and market approach to include wireless systems, in particular private and public radio networks. Today, M/A-COM has more then 3,000 worldwide employees, 1500 of which are located in Massachusetts.

    The defendant Sullivan worked at M/A-COM during the period from October 7, 1983 to December 14, 2001, when he was suspended without pay for gross misconduct. M/A-COM terminated the defendant for cause on January 25, 2002, as a result of the defendant's embezzlement of hundreds of thousands of dollars from M/A-COM. The defendant began his

career at M/A-COM as human resources manager, then human resources director with the following areas reporting into him; international HR, immigration, employment and compliance.

## THE DEFENDANT'S CERTIFICATION TO ACT LEGALLY AND ETHICALLY

During his employment at M/A-COM, the defendant was promoted based in part upon his apparent honesty and integrity, core values of M/A-COM. In fact, while the defendant was employed at M/A-COM, the defendant annually signed the company's code of conduct, and certified that he would comply and be bound by the code, which required the defendant to comply with all laws and neither commit, condone or ratify any illegal or unethical acts for any reason. In addition, as a supervisor, the defendant agreed to hold himself to a higher standard of conduct required by the company. In particular, as the Director of Human Resources, the defendant was responsible to, among other things, "ensure that all new employees receive proper orientation in these standards and to obtain acknowledgement of understanding from each employee." I am attaching a copy of the relevant codes of conduct which the defendant signed freely and voluntarily.

Further, as the Director of Human Resources, the defendant was responsible to work with other company representatives for the investigation of all reported violations of these standards. In that position, the defendant showed little mercy for employees who broke the law and violated the company's code of conduct. On matters handled by the defendant involving employee theft, the defendant routinely took the position that the employee be prosecuted to the full extent of the law, where possible, and if not, the employee's employment be immediately terminated.

One example that illustrates the defendant's treatment of a similar situated former employee of M/A-COM involved the investigation of a purchasing manager at M/A-COM's facility in Torrance, California in 1998. During the course of the investigation conducted by the defendant and M/A-COM's in-house counsel, it was discovered that the purchasing manager had stolen several hundred thousand dollars from M/A-COM by setting up factitious vendors that were invoicing M/A-COM for non-existent products and by forging company documents to pay the invoices. The defendant pursued every possible avenue to insure that the purchasing manager was prosecuted to the fullest extent of the law. For example, the defendant hired a private investigator to work the case and to act as the primary interface with the district attorneys office prosecuting the case. In that case, which is virtually identical to the facts of this case and involved the same type of embezzlement committed by the defendant here, the defendant insisted that the purchasing manager not only make restitution but also serve jail time, while he himself was defrauding M/A-COM. The purchasing manager, a mother with children, was sentenced to 6 months in jail in 2000 and was ordered to pay restitution.

The defendant also received favorable performance evaluations and reviews based in large part upon his apparent honest and ethical behavior. For example, in his performance evaluation for the period from January 1, 1998 to December 31, 1998, the defendant's supervisor wrote that the defendant: "shows honesty, integrity, not misrepresenting facts;" "demonstrates public responsibility;" "is ethical, practicing high standards of business conduct, as evident in actions." In that same performance evaluation, the defendant's most important financial objectives and responsibilities were described as: (a) decreasing operating expenses' and (b) control expenditures within the H/R budget.

## THE BREACH OF TRUST COMMITTED BY THE DEFENDANT

In light of the foregoing, by engaging during the period from 1996 to 2001, in a scheme to manufacture and submit false invoices to M/A-COM to defraud the company of a staggering $692,696.76, the defendant grievously breached his ethical and legal duties owed to the company. Moreover, as the Director of the Human Relations department, the defendant occupied a position of trust with the company, which he used to his advantage to carryout his scheme. The defendant's fraudulent conduct for which he has plead guilty violated that trust which the company had placed in the defendant.

The nearly $700,000 stolen by the defendant greatly reduced the amount of funds available to M/A-COM to do the following critical matters: (1) invest in the future growth of the company; (2) invest the welfare of its employees and (3) to mitigate the impact of employee layoffs during this period. Every dollar stolen by the defendant was a dollar denied to M/A-COM and its employees.

Further, the defendant's fraudulent conduct also injured M/A-COM's reputation for honesty and integrity, both of which are crucial for M/A-COM to continue to acquire significant government and private business contracts. Because of the large number of government contracts which M/A-COM has and seeks, M/A-COM's credibility and integrity are, along with its superior products, technology and employees, its most important currency in dealing with public agencies, including national security agencies. Having its Director of Human Relations plead guilty to committing a massive fraud and stealing nearly $700,000.00 has harmed M/A-COM's business reputation.

## THE DEFENDANT MUST PAY RESTITUTION IMMEDIATELY

The court should order the defendant to pay to M/A-COM immediately restitution in the full amount stolen by the defendant. During the period of his fraud, the defendant received approximately $721,374 in salary, bonuses and deferred compensation in addition to the usual package of benefits, including life and health insurance. In addition, the defendant was granted approximately 18,500 options during this period.

We understand that at the time the defendant was stealing monies from M/A-COM, the defendant acquired real property in Florida, made improvements worth hundreds of thousands of dollars to his residence in Beverly, Massachusetts, and drove a luxury car. By now, it is uncontrovertible that the defendant committed fraud; equally uncontrovertible is the fact that the defendant enjoyed the fruits of his fraud through a life-style enhanced significantly by the monies stolen from M/A-COM. In these circumstances, the defendant should be ordered to pay to M/A-COM immediately the full amount of $692,696.57 which he stole from the company. If the court does not require such immediate payment of the full amount of restitution, the defendant will continue to be unjustly enriched by the fruits of his fraud, and M/A-COM will continue to be victimized. Put simply, the court should not permit the defendant and his family to continue to enjoy the lifestyle which he acquired through fraud and deceit, rather than through honest, hard work.

In closing, M/A-COM requests that the court impose upon the defendant a sentence consisting of: 1) lengthy incarceration; and 2) restitution in the amount of $692,696.57 which is

the amount the defendant stole from M/A-COM, which restitution should be paid immediately. Justice demands that this sentence be imposed upon the defendant who victimized M/A-COM.

Should you require any additional information, please contact me. M/A-COM representatives will attend the sentencing of the defendant and requests permission to make a short victim impact statement in court.

Thank you.

Very truly yours,

Kevin Kelleher
Director of Accounting